James M. ARMSTRONG,
Petitioner-Appellant,

v.

J. A. COLLIER et al., Superintendent of
Mississippi State Penitentiary,
Respondents-Appellees.

No. 75–3147.

United States Court of Appeals,
Fifth Circuit.

July 29, 1976.

Orma R. Smith, Jr. (Court-Appointed), Wendell J. Trapp Jr., Corinth, Miss., for petitioner-appellant.

Timmie Hancock, Asst. Atty. Gen., A. F. Summer, Atty. Gen., Jackson, Miss., for respondents-appellees.

Before GEWIN, COLEMAN and GOLD-BERG, Circuit Judges.

GEWIN, Circuit Judge:

Appellant James M. Armstrong appeals from the denial of his petition for habeas corpus relief, under 28 U.S.C. § 2254, attacking a Mississippi conviction for manslaughter. We affirm.

I

On May 16, 1966, Ed Massengill was killed in his home in Alcorn County, Mississippi as a result of several blows to the head with a blunt instrument. The body was not discovered until the next morning, at which time the investigation was begun. Suspicion quickly focused upon appellant Armstrong when it was discovered that Massengill's car was missing and that Armstrong had not reported for work at the truck stop where he was employed, which was located directly across the highway from the deceased's home. Law enforcement authorities in neighboring areas were alerted, and the sheriff of a nearby county found and arrested Armstrong; when he asked Arm-

strong if he had killed Massengill, he replied, "I did." Armstrong was taken to the truck stop, where a large and apparently unfriendly crowd had gathered. When he was taken to the scene of the crime, Armstrong stated that he had killed Massengill with an iron pipe. Following Armstrong's directions, officers recovered Massengill's automobile, from which they obtained Armstrong's fingerprints.

On the evening of his arrest, Armstrong again confessed in the presence of several highway patrol officers, and gave them a shirt with blood on it. The following day, the county attorney attempted to tape record Armstrong's statement, but the recorder did not function properly, so the prosecutor then obtained his written statement. Armstrong stated that he had gone to Massengill's house to deliver a message, whereupon Massengill had threatened him with a pistol. As they struggled, Armstrong saw a pipe on the floor, seized it, and hit Massengill on the head two or three times. He then took the victim's car, disposed of the pipe and pistol, and picked up a friend, Jane Bowen, who apparently rode around with him for some time before he abandoned the car. Armstrong was taken to the place where he claimed to have disposed of the pipe and pistol, but a search for the weapons was fruitless.

Armstrong was charged with murder. The trial court denied his pretrial discovery motion seeking production of documents, photographs, and other tangible evidence in the possession of the prosecution and relating to the merits of the case. The defendant also requested during the trial that the court require the prosecution to furnish him copies of any statements of witnesses who had testified, for purposes of cross-examination. The judge examined these statements *in camera* to determine if there were any inconsistencies with the testimony given on the stand and, being convinced that there were none, he denied the motion.

At trial, which was before a jury, Armstrong objected to the admission into evidence of his various confessions. Following a hearing, the trial court excluded the first three confessions, made upon his arrest, at the truck stop, and on the evening of his arrest; he admitted, however, the confessions made to the county attorney on the day following his arrest. In addition to this evidence, the state presented the testimony of Jane Bowen, who was with Armstrong on the night of the murder; she testified that he told her at that time that he had hit Massengill with an iron pipe and that he was dead. The prosecution also called a Mr. and Mrs. Strickland, who stated that defendant came to their house on the afternoon after the murder and told them that he had had a scuffle with Massengill and had hit him with an iron pipe.

Testifying in his defense, Armstrong admitted making the various statements related above, but denied that they were true. He stated that when he arrived at Massengill's house to deliver the message, he found Massengill lying dead on the floor; George Mason, who also worked at the truck stop across the highway, was standing near the body holding a tire tool and looking for a check with his (Mason's) name on it. Armstrong testified that Mason threatened his (Armstrong's) wife and child, said that he (Mason) would kill Armstrong if he related that he had seen, and told Armstrong to take Massengill's car and leave. Armstrong said he got the blood on his shirt while trying to get the car keys from the victim's pocket.

Armstrong presented witnesses who testified to some "bad blood" between Mason and Massengill, particularly concerning a rent diversion payment from the federal government.[1] Two witnesses described a heated argument, which occurred about two weeks before the murder, between Mason and Massengill concerning a government check. Mason told one of the witnesses

---

1. Apparently Mason had been renting some farm land from Massengill, and the defense alleged that Massengill had terminated Mason's tenancy in an effort to prevent him from re-

ceiving his 75% share, as tenant, of the payment from the Agricultural Stabilization and Conservation Service.

that "he was going to get what was coming to him one way or the other," and to another Mason said "he would die and go to hell before [Massengill] would get the check." There was also testimony, corroborated by Mason, that Mason owed Massengill over eight hundred dollars. Mason admitted that he and Massengill had "had our little arguments," but he denied that the argument over the check had occurred and denied ever threatening Massengill, Armstrong, or Armstrong's family.

The jury convicted Armstrong of manslaughter, and he was sentenced to twenty years' imprisonment. On appeal to the Mississippi Supreme Court Armstrong challenged, *inter alia,* the trial court's denial of his discovery motions. That court noted that this issue had given it "considerable concern," *Armstrong v. State,* 214 So.2d 589, 594 (Miss.1968), but after a detailed review of the law it concluded as follows:

> It is becoming increasingly clear from a study of the foregoing authorities that . . . the defendant should be permitted to inspect tangible evidence which may be used against him or which may be useful in his defense. . . .

> We are of the opinion that the trial judge in the instant case should have granted to the defendant the right to inspect the photographs, confessions and other tangible evidence; however, we are of the further opinion that the denial of the right to inspect the requested evidence was not prejudicial to the defendant under the facts here shown. . . .

> We hold, therefore, that the failure of the trial court to permit an inspection of the requested evidence in the instant case was not a reversible error. An early inspection of tangible evidence could not

have changed the course of the trial nor have influenced the verdict of the jury. 214 So.2d at 596–97. Armstrong's petition for writ of certiorari to the United States Supreme Court was denied. 395 U.S. 965, 89 S.Ct. 2109, 23 L.Ed.2d 750 (1969).

## II

In March of 1972, Armstrong filed a pro se petition in federal court for a writ of habeas corpus, 28 U.S.C. § 2254; among the reasons assigned in support thereof was the trial court's denial of his discovery motions. The matter was submitted to a magistrate, whose report and recommendations were approved and adopted by the district court; on September 24, 1973, the court ordered the state to "make available to the applicant for inspection and copying, all evidence, information or other material in its possession not a part of the record when applicant's case was before the Mississippi Supreme Court, and which may be favorable to him and material to his guilt or punishment." The court directed the magistrate to conduct an evidentiary hearing to determine whether any of the evidence that might be so revealed was of the type that, under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), should have been disclosed to the defense at the time of trial.

The magistrate conducted two hearings, on January 8, 1974, and June 3, 1974. In reaching its decision the district court considered the transcripts of those hearings as depositions of the witnesses examined.[2] As a result of the court's discovery order and the evidentiary hearings, Armstrong developed two items of evidence that he alleged should, under *Brady,* have been disclosed to him. These were (1) a pretrial statement given by Mason to Jimmy Warren, an inves-

---

2. On June 26, 1974, the Supreme Court decided *Wingo v. Wedding,* 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974), which held that magistrates are not empowered to conduct evidentiary hearings in habeas corpus cases. This court held in *Donivan v. Henderson,* 506 F.2d 434 (5th Cir.), vacated and remanded for consideration of question of mootness, 421 U.S. 996, 95 S.Ct. 2392, 44 L.Ed.2d 663 (1975), that the *Wingo* rule had retroactive effect. The parties

in the instant case, however, filed a stipulation agreeing that the transcripts of the hearings conducted by the magistrate might "be considered as if oral testimony had been presented before Judge William C. Keady . . . " and that "Judge William C. Keady be allowed to enter a decision in this cause based upon the transcript of the proceedings conducted . . . " before the magistrate.

tigator for the Mississippi Highway Patrol; and (2) the following notation in Warren's investigative notebook: "Douglas Austin told Bright that Geo & Massengill had been fallen out and that Geo Mason would drive iron stobs into cottonfield." [3] Armstrong also introduced a copy of a local newspaper dated May 19, 1966 that contained an article stating that on May 18, the will and other papers of the deceased, including a letter from the Agricultural Stabilization and Conservation Service, were found by a mail carrier on a field road in a nearby county.

Armstrong alleged that the statement by Mason to Warren could have been used to impeach Mason's testimony, because of discrepancies in the times at which he indicated certain events occurred. The district court, while noting that this evidence was considered by both the state trial court and the Mississippi Supreme Court, and therefore was not within the scope of its discovery order, nevertheless considered and rejected Armstrong's argument that this constituted *Brady* material. The court found that Mason repeatedly stated during his trial testimony that he was not wearing a watch and that his statements as to the times certain events occurred were only estimates. Therefore, the court found, the statement was not likely to have affected the jury's verdict, as required by *Brady* and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

As to the notation in Warren's notebook, the court concluded that, being of a fourth-hand nature (Mason to Austin to Bright to Warren), it was of doubtful materiality and, moreover, it was merely cumulative, since the defense had been able to develop by other means its theory of "bad blood" between Mason and Massengill.

The court found no evidence to support Armstrong's contention that the newspaper article somehow supported his defense theory, and noted that in any event, it did not

constitute evidence wrongfully withheld from the defense by the prosecution.

For reasons that are not evident from the record, the district court failed to rule on an additional issue, which, it appears, was properly raised before and presented to it. This concerns the fact that the county attorney's file on Armstrong's case has been lost. When this was discovered, Armstrong filed a motion requesting the court to grant the relief sought on the ground that the state had not complied with the court's discovery order. The state filed a response to the motion, and virtually all of the first evidentiary hearing was devoted to this question.

### III

Before this court, Armstrong challenges the district court's rulings on the Mason statement and the notation in Warren's notebook, and contends that the state's inability to produce the county attorney's file violates his due process rights and requires that the relief sought be granted.

### A

We agree with the district court's conclusion that the prosecution's failure to disclose the two items of evidence developed below does not warrant granting petitioner habeas corpus relief. In *Brady v. Maryland,* 373 U.S. 83, 87, 10 L.Ed.2d 215, 218, 83 S.Ct. 1194 (1963), the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *See Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). The *Brady* doctrine was applied to evidence useful for impeachment purposes in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), but the Court, through Chief Justice Burger, added the following caveat:

---

**3.** Armstrong alleged that Massengill's cottonpicking machinery would have been damaged if iron stakes were driven into his field.

We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . ." [citation omitted] A finding of materiality of the evidence is required under Brady . . .. A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ."

*Id.* at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108.

We conclude that the two pieces of evidence, the nondisclosure of which Armstrong complains, were of the type "possibly useful to the defense but not likely to have changed the verdict." *Id.* As the Mississippi Supreme Court stressed, the trial court erred in denying Armstrong's discovery request. In view of the strong evidence against the defendant, however, we cannot conclude that, had the two items of evidence under consideration here been available to the defense, there is any "reasonable likelihood" that the verdict of the jury would have been affected thereby.

## B

■■■ A more difficult problem is presented by the district court's failure to rule on the effect of the lost file on Armstrong's petition. Rule 52(a), Fed.R.Civ.P., requires the district court to make findings of fact and conclusions of law thereon in "all actions tried upon the facts without a jury . . . ." Where the court has failed to comply with this rule, the normal procedure is to vacate the judgment and remand the case for appropriate findings. *See Tomlin v. Ceres Corp.,* 507 F.2d 642, 648 n. 2 (5th Cir. 1975). It is well settled, however, that "compliance with Rule 52(a) is not a *jurisdictional* requirement for appeal . . . .," *Davis v. United States,* 422 F.2d 1139, 1142 (5th Cir. 1970) (emphasis in original), and "[t]he purpose of this rule is to facilitate appellate review and it must not be applied so as to prohibit review by the Court of Appeals where there is a sufficient basis for the court to consider the merits of the case." *McCawley v. Ozeanosun Compania, Maritime, S.A.,* 505 F.2d 26, 30 n. 4 (5th Cir. 1974); *see Tomlin v. Ceres Corp., supra; Huard-Steinheiser, Inc. v. Henry,* 280 F.2d 79, 84 (6th Cir. 1960). Thus, it is established that a remand is not required "if a complete understanding of the issues may be had without the aid of separate findings," *Swanson v. Levy,* 509 F.2d 859, 861 (9th Cir. 1974). For example, a remand is often deemed unnecessary "If all the evidence is documentary and the appellate court can pass upon the facts as well as the trial court, or if all the facts relied upon to support the judgment are in the record and are undisputed, or if the record as a whole presents no genuine issue as to any material fact." *King v. Commissioner of Internal Revenue,* 458 F.2d 245, 249 (6th Cir. 1972). *See generally* 5A J. Moore, Moore's Federal Practice ¶ 52.06[2] (2d ed. 1975); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2577 at 699–702 (1971). We conclude that a complete understanding of the issue may be had from the record on appeal, and that remand to the district court is unnecessary. *See Withrow v. Larkin,* 421 U.S. 35, 45, 95 S.Ct. 1456, 1459, 43 L.Ed.2d 712, 722 (1975) (remand for findings and conclusions not ordered, although it "would be justified," where it was unlikely to "add anything essential to the determination of the merits").

The principles developed in *Brady* and its successors are relevant to our determination of the issue presented here; lost evidence cases are essentially permutations of failure-to-disclose cases. The Supreme Court dealt with the special problem of lost evidence in *United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). An accused in military court-martial proceedings sought discovery of tape recordings made of the interrogation of himself and of a prosecution witness; it developed that the tapes had been lost. The Court noted that "the Government bore the burden of producing [the tapes] or explaining why it could not do so." *Id.* at 355–56, 89 S.Ct. at 533, 21 L.Ed.2d at 545. The Court found the government's explanation adequate; the record contained extensive testi-

mony concerning the facilities used and the routine followed in handling such tapes, and disclosed that "an earnest effort was made to locate them." *Id.* at 355, 89 S.Ct. at 533, 21 L.Ed.2d at 545. Accordingly, the Court found no violation of due process even though the evidence was clearly discoverable under the Jencks Act, 18 U.S.C. § 3500.

Perhaps the leading authority in this area is *United States v. Bryant,* 142 U.S.App. D.C. 132, 439 F.2d 642 (1971). The issue, as the court defined it, was "whether intentional non-preservation by investigators . . . of discoverable evidence amounts to its illegal suppression." *Id.* at 644. A tape recording of a conversation, which the court found was "absolutely crucial to the question of appellants' guilt or innocence," *id.* at 648, had been misplaced. The record indicated that the investigators "made *no* effort to preserve" the tape, *id.* at 646 (emphasis in original), and the court found "at the very least a hint of bad faith . . ." *Id.* at 647. Examining the issue in the context of the Jencks Act, *Brady,* and the Federal Rules of Criminal Procedure, the court concluded that good faith would excuse loss of evidence, but cautioned:

> An exception for good faith loss of important evidence must not be allowed to swallow the discovery rules, and the burden of explanation on the Government must be a heavy one; but criminal convictions otherwise based on sufficient evidence may be permitted to stand so long as the Government made "earnest efforts" to preserve crucial materials and to find them once a discovery request is made.

*Id.* at 651. This circuit has recognized *Bryant*'s good faith exception. *United States v. Rojas,* 502 F.2d 1042, (5th Cir. 1974); *see United States v. Hildebrand,* 506 F.2d 406, 409–10 (5th Cir.), *cert. denied,* 421 U.S. 968, 95 S.Ct. 1961, 44 L.Ed.2d 457

(1975). The *Bryant* court remanded the case for a determination of whether the indictment should be dismissed, based on three factors: the degree of negligence or bad faith on the part of the government, the importance of the evidence lost, and the evidence of guilt adduced at trial.[4]

At the evidentiary hearing conducted in the instant case, the state presented the testimony of the current county attorney, Ronald Windsor, and that of Neal Biggers, who was county attorney when Armstrong was tried and is now a state circuit judge. Windsor testified that he is the custodian of the records customarily included in the files of the county attorney. He described the manner in which he received the files from his predecessor, how and where they are maintained, and his efforts to locate the file pertaining to Armstrong's case; he also testified that he had not destroyed, disposed of, removed, or permitted anyone else to remove, any of the files that were turned over to him upon his taking office.

Biggers testified at great length concerning the Armstrong file. He had participated in the investigation of the case and maintained a file on it, which he turned over to his successor when he left office in 1968, and had not seen since that time; his efforts to locate the file had been unavailing. Concerning the contents of the file, Biggers stated that any information in his file would be largely that which he himself had accumulated; the file would not have contained investigative reports, such as the autopsy report or the FBI report on Armstrong's fingerprints, but it probably would have contained a copy of Armstrong's confession. He also stated that the file probably contained a report from officer Warren, consisting of "a synopsis of his investigation," which might or might not have included copies of statements from the witnesses Warren had interviewed.[5]

---

4. On remand, the district court concluded that the government's actions did not constitute the bad faith that would warrant dismissal of the indictment. 331 F.Supp. 927 (D.D.C.1971). The Court of Appeals affirmed. It found that the government's extreme negligence was outweighed by such factors as the poor quality of the recording and the strong evidence of guilt adduced at trial. 145 U.S.App.D.C. 259, 448 F.2d 1182 (1971).

5. Warren's investigative notes were turned over to Armstrong in the course of the proceedings below.

Biggers testified that at the time of the Armstrong trial, he was aware of the rule announced in *Brady v. Maryland, supra,* and that the prosecution had possessed no *Brady* material. He stated unequivocally, "All of the evidence which was brought to my attention, either through my own investigation or through the information that was given to me by the law enforcement officers, pointed to James Armstrong's guilt only. There was never any information or any other evidence that was brought out by any of the investigations that pointed to anything other than his guilt." Biggers testified further that "[a]ll of the evidence that the State had was brought out at trial of the case . . . [W]e submitted every sintilla [sic] of evidence that we had in our possession to the jury for its consideration." Finally, when asked by Armstrong's counsel whether the state had investigated the possibility of "any previous trouble between Massengill and Mason," Biggers responded:

> [W]e had no reason to make any investigation as to any trouble between Mason and Massengill for this reason. The first time any law enforcement officers were ever told by Mr. Armstrong that Mr. Mason was the one who hit and killed Mr. Massengill was the day he took the stand at his trial. Up until that time he had told everybody he talked to that he himself killed Mr. Massengill, and our investigations were working along those lines. Then after he took the stand, after had [sic] been in custody for weeks or months however long it was at the time he was arrested to the time of trial he came up with this completely different story that it wasn't him but that it was Mason. So why would we have any reason to investigate any trouble between Massengill and Mason?

■ Viewing the record in its entirety, we cannot conclude that the disappearance of the county attorney's file on the case results in a denial of Armstrong's due process rights and requires that the relief sought be granted. Appellant specifically disclaims any contention that the prosecution "intentionally destroyed" evidence in the file or "overtly exercised bad faith" in failing to produce the file, and we find in the record not so much as a hint of such misconduct. By the time of the evidentiary hearing, some seven years had elapsed since Armstrong's conviction, and almost eight years since the crime was committed; several different persons had occupied the office of county attorney, and the files apparently had been moved more than once. We conclude that the record demonstrates that the state made "earnest efforts" to preserve the material sought and to locate it for production in compliance with the court's order. The petitioner has been unable to demonstrate that anything of importance to his defense and not as yet revealed to him was or even might have been contained in the file. Moreover, the state's evidence against Armstrong at trial was overwhelming. Based on the foregoing facts, we conclude that the loss of the file will not support a grant of habeas corpus relief.

If we were to conclude that petitioner's constitutional rights were violated because the county attorney's file has been lost, admittedly without bad faith, our decision would be tantamount to a release of the petitioner. Apparently the file cannot be produced. In view of the overwhelming evidence of guilt, including a confession to his female companion and others immediately following the homicide, we decline to so hold. As succinctly stated in *Moore v. Illinois, supra,*

> We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.

408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706, 713. Moreover, our conclusion is buttressed by the careful consideration given to this case by the Supreme Court of Mississippi, *Armstrong v. State, supra. See Moore v. Illinois, supra; Avery v. Alabama,* 308 U.S. 444, 60 S.Ct. 321, 81 L.Ed. 377 (1939).

AFFIRMED.