**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Edmond G. MIRANNE and Edmond G.
Miranne, Jr., Defendants-Appellants.**

**No. 81–3484.**

United States Court of Appeals,
Fifth Circuit.

Sept. 27, 1982.

Certiorari Denied Jan. 10, 1983.
See 103 S.Ct. 736.

---

Dymond, Crull & Castaing, F. Irvin Dymond, New Orleans, La., for Edmond G. Miranne, Sr.

Lemle, Kelleher, Kohlmyer & Matthews, Don M. Richard, New Orleans, La., for Edmond G. Miranne, Jr.

John P. Volz, U. S. Atty., W. Glenn Burns, Asst. U. S. Atty., New Orleans, La., for plaintiff-appellee.

Before GEE and JOHNSON, Circuit Judges, and VAN PELT *, Senior District Judge.

VAN PELT, Senior District Judge:

Appellants Edmond G. Miranne (hereinafter referred to as Miranne, Sr.,) and Edmond G. Miranne, Jr., appeal their convictions of April 24, 1981, in the district court[1] which were based on a 103 count indictment. Count 1 charged Miranne, Sr., Miranne, Jr., and Burt Mahl, III, with conspiracy, 18 U.S.C. 371 (1976), in violating 18 U.S.C. §§ 657, 1014 (1976). Counts 2–51 charged the defendants with the substantive offense of making or causing to be made a false statement in a loan application to Security Homestead Association, a federally insured savings and loan association, in violation of 18 U.S.C. §§ 1014[2] and 2 (1976). Counts 52–101 charged Miranne, Sr., and Miranne, Jr., as officers of the association, with the misapplication of money belonging to the association in violation of 18 U.S.C. §§ 657[3] and 2 (1976). Counts 102 and 103 charge only Miranne, Sr., with perjury in violation of 18 U.S.C. 1621 (1976).

Defendant Mahl entered a plea of guilty to count 1, the conspiracy charge, and agreed to serve as a witness for the government against the Mirannes. Miranne, Jr., was found guilty by a jury on counts 1–101. Miranne, Sr., was found guilty by the same jury on counts 1, 26–51, and 76–103.

On August 12, 1981, Miranne, Sr., was sentenced to two years imprisonment on each of the 55 counts, the terms to run concurrently, and fined $27,500. The execution of the prison sentences was suspended and Miranne, Sr., was placed on three years probation. As a condition of probation, he was ordered to pay $130,000 in restitution to the savings and loan association and to perform 320 hours of public service work.

Miranne, Jr., was sentenced to two years imprisonment for each of the 101 counts, sentences to run concurrently, and fined $27,775. Execution of the prison terms was suspended and three years of probation imposed. As a special condition of probation, Miranne, Jr., was ordered to perform 320 hours of public service work and to undergo treatment for alcoholism.

On appeal, appellants raise the following assignments of error: (1) the court erred in denying appellants' motion to dismiss or to compel election of counts; (2) the district judge erred in refusing to recuse himself; (3) the government failed to preserve certain exculpatory material in violation of *Brady v. Maryland;* (4) whether a conviction supported largely by perjured testimony, which is known by the government, should be allowed to stand; and (5) was the evidence involving the perjury counts tainted? We have analyzed these contentions and find no grounds for reversal. Thus we affirm the judgment of the district court. Before discussing our reasoning in this opinion, it would be helpful to briefly outline the persons and events involved.

I

In outlining the facts of this case, we must remember that our review is limited and that we must consider the facts in light most favorable to the government. *United States v. White,* 450 F.2d 264 (5th Cir.

---

* District Judge of the District of Nebraska, sitting by designation.

1. The Honorable Edward J. Boyle, United States District Judge for the Eastern District of Louisiana presiding.

2. 18 U.S.C. § 1014 provides in pertinent part: Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... upon any application ... or loan ... shall be fined not more than $5,000

or imprisoned for not more than two years or both.

3. 18 U.S.C. § 657 provides in pertinent part: Whoever, being an officer ... of or connected in any capacity with ... any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... willfully misapplies any moneys ... belonging to such institution or pledged or otherwise intrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years.

1971), *cert. denied,* 405 U.S. 1072, 92 S.Ct. 1523, 31 L.Ed.2d 805 (1972).

At the time of the transactions which gave rise to this prosecution, Miranne, Sr., was the president and chief executive officer of Security Homestead Association, a federally insured savings and loan association in New Orleans, Louisiana. His son, Miranne, Jr., was the association's attorney and a member of its board of directors. Burt Mahl, III, was a local real estate developer. From a review of the evidence, it appears that Mahl was in need of financing to purchase various properties in the New Orleans area. He went to the Mirannes to acquire such financing. Early in 1976, Miranne, Jr., introduced Mahl to Joseph Toranto. Toranto was a loan officer in charge of Security Homestead's Family Finance Center. Toranto was limited by state law to granting secured loans up to $10,000 for home improvement, not purchase.

Mahl applied for and received 50 loans for a total of approximately $460,000. These loans can be divided into three groups: 24 applied for on January 12, 1976; 18 on February 20, 1976; and 8 on May 13, 1976. On each loan application, the stated purpose for the loan was to "renovate property."

Without going into detail, it is apparent that the Mirannes provided Mahl with several shortcuts from the normal loan approval procedure. In addition, it appears that, for their efforts, the Mirannes received kickbacks from the unused proceeds of the loans, and possibly part ownership in properties which were purchased with the loan moneys.

## II

In their second assignment of error, appellants argue that District Judge Edward J. Boyle erred in denying appellants' motion to recuse himself "on the grounds of potential bias and prejudice against the defendants and/or the appearance thereof...." [4] We first address the recusal issue because, if meritorious, discussion of the remaining errors would be unnecessary.

Prior to this motion for recusal, three other district judges had disqualified themselves in this case due to personal relationships with the appellants or financial interests in Security Homestead. As to Judge Boyle, the appellants alleged in an affidavit that the Judge's son, Edward J. Boyle, Jr., was one of two court-appointed attorneys representing the trustees of the bankrupt Fountainbleau Hotel Corporation in a 1976 state court civil action brought by the trustees against Fountainbleau—Orleans, a Louisiana partnership. The lawsuit was still pending at the time of the trial of this case. Appellants further alleged that the Mirannes have a 21 percent interest in the partnership. Finally, appellants alleged that "[a]s a result of the substantial claim for liability and because of [unspecified] actions taken by Edward J. Boyle, Jr., the trustees and others, to defendant's loss and detriment, defendant has intended for a period preceding this indictment. to file a civil suit against all of said parties." [5]

Appellants filed the motion under 28 U.S.C. §§ 144 [6] and 455(a). [7] As stated in *Davis v. Board of School Commissioners of*

---

4. Motion to Recuse Judge, Record, Vol. I, at 70.

5. Affidavit of Appellants, Record, Vol. I, at 76.

6. 28 U.S.C. § 144 provides:
   Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding. The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term [session] at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

7. 28 U.S.C. § 455(a) provides:
   Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

*Mobile County,* 517 F.2d 1044, 1051 (5th Cir. 1975): "Once the motion is filed under § 144, the judge must pass on the legal sufficiency of the affidavits, but may not pass on the truth of the matter alleged." In order to be legally sufficient, the affidavit must meet, among other requirements, the following test:

"1. The facts must be material and stated with particularity;

"2. The facts must be such that, if true they would convince a reasonable man that a bias exists;

"3. The facts must show the bias is personal, as opposed to judicial, in nature."

*Parrish v. Board of Commissioners of Alabama State Bar,* 524 F.2d 98, 100 (5th Cir. 1975) (en banc), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976), quoting *United States v. Thompson,* 483 F.2d 527, 528 (3d Cir.) *motion denied,* 415 U.S. 911, 94 S.Ct. 1456, 39 L.Ed.2d 496 (1974).

■ We agree with Judge Boyle that § 144 did not require his recusal. The affidavit only alleged a "potential bias" and did not allege facts which support the contention that an actual and present bias existed. In addition, the argument that Judge Boyle possessed a bias because his son was an attorney in a lawsuit against a partnership in which the appellants had a small interest without demonstrating what beneficial effect, if any, the conviction of the appellants would incur upon Boyle, Jr., is far too speculative to convince a reasonable man that a bias existed. The same conclusion is applicable to the appellants' allegation that, for some time, they had thought about bringing a civil action against Boyle, Jr. The civil action against the Fountainbleau partnership had been in existence for five years at the time the motion for recusal was filed. The fact that the appellants had not brought the threatened action against Boyle, Jr., during that time raises serious question as to the weight to be given appellants' allegation.

■■ Section 455(a) is a self-enforcing statutory standard for disqualification of a judge. *Davis, supra* at 1051. It is broader than § 144 in that it requires a judge to disqualify himself when "his impartiality might reasonably be questioned." Thus, under § 455(a) an actual demonstrated prejudice need not exist in order for a judge to be required to recuse himself. "Section 455(a) is a general safeguard of the appearance of impartiality and establishes a 'reasonable factual basis-reasonable man' standard." *Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 569 F.2d 251 (5th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). Because of the speculative nature of appellants' allegations, we hold that a reasonable man, viewing the facts as they stood at the time of the motion, would not reasonably question Judge Boyle's impartiality and that Judge Boyle did not abuse his discretion in denying the motion for recusal.

### III

In their first assignment of error, appellants contend that, as to the first 42 loans and the corresponding charges (counts 2–43 and 52–93), the counts in the indictment were multiplicious and that the court should have granted appellants' motion to dismiss the indictment or to compel election of counts. Appellants' argument is based on the fact that the first loan application, signed by Mahl, was photocopied 41 times to make up a total of 42 loan applications for different pieces of property.

On January 12, 1976, the first loan application was filled out by Toranto and signed by Mahl. Toranto then had this loan application photocopied 23 times to make up the 24 applications in the first group. Each of these applications was placed in a separate loan file. In addition, each loan was secured by a separate and distinct property which Mahl claimed he owned but which instead he purchased with the loan money.

On February 20, 1976, Mahl applied for and received 18 additional loans with which he purchased 15 properties. On this occasion, the application procedure was similar to that used for the first group of loans except that Mahl did not physically sign

any of the applications. Instead, someone in the Home Finance Center other than Toranto photocopied the original application, altered the date, and then created 18 copies which were filed in the same manner as the first group.

Based on these facts, appellants argue that, as to the first 42 loans, there was only one false statement which was photocopied 41 times and that if any criminal liability exists, it is only in relation to the original application. Therefore, they argue, the 42 counts each of making a false statement and misapplication of the loan proceeds are multiplicious. The evil which appellants perceive and seek to correct is based on their concern that "the repeated assertion of the details of a singular course of conduct in multiple counts will prejudice the defendant and confuse the jury by suggesting that not one but several crimes have been committed." *See e.g. United States v. Hearod,* 499 F.2d 1003, 1005 (5th Cir. 1974).

This case is unlike cases where multiple charges for several false statements in a single document were held to be multiplicious. *See United States v. Sue,* 586 F.2d 70 (8th Cir. 1978); *United States v. Sahley,* 526 F.2d 913 (5th Cir. 1976). Neither is it like cases where the intended unit of prosecution is unclear. *See United States v. Mason,* 611 F.2d 49 (4th Cir. 1979); *United States v. Long,* 524 F.2d 660 (9th Cir. 1975). Here, the unit of prosecution is specifically defined. Title 18 U.S.C. § 1014 proscribes the making of "any false statement or report."

■ We do not agree with appellants that the case at hand is one of a single false statement and a single transaction. Instead we find that the indictment correctly charged appellants with 42 false statements in 42 separate transactions. The fact that a photocopier was used to save Mahl and/or the appellants from the inconvenience of filling out and signing 42 separate loan applications is not sufficient to reduce their actions to a single crime. Each of the 42 loan applications was treated as distinct from the others. The applications were placed in separate files. The loans were secured by separate pieces of property, with three exceptions proven to be fraudulent at trial. Separate promissory notes were issued for each loan. In addition, 42 separate mortgages were recorded by Security Homestead and separate loan checks issued. Separate legal fees for the processing of each loan were paid to Security Homestead's law firm, composed of Miranne, Sr., and Miranne, Jr. Finally, Mahl's original signature appears at least six times per file on documents relating to each loan and attached to the loan application.[8]

In light of these facts, we hold that the individual counts relating to the 42 loan applications were justified and that the court did not err in denying appellants' motion to dismiss or compel an election of counts.

■ Assuming, arguendo, that the counts in the indictment were multiplicious, we have difficulty understanding how these charges improperly prejudiced the appellants' case. The first assignment of error does not challenge the counts relating to the last eight loan applications which were separately and individually signed by Mahl. Even if we agreed with appellants' argument that only the original loan was subject to prosecution, the counts for that first loan, plus the counts relating to the last eight loans, would still come to a total of nine counts each for the making of a false statement and the misapplication of loan

---

8. Appellants imply that no evidence was presented to the jury showing that Mahl had knowledge that the one application which he signed was photocopied 41 times and thus, as to the 41 counts, insufficient evidence was produced to prove the knowledgeable making of a false statement which is a necessary element of the crime charged. *United States v. Lentz,* 524 F.2d 69 (5th Cir. 1975), *rehearing denied,* 526 F.2d 815 (5th Cir. 1976). Mindful that our review is limited, *United States v. Klein,* 560 F.2d 1236 (5th Cir. 1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978), we find appellants' argument is without merit. In his testimony, Mahl admitted to signing separate sets of documents for each loan. This, along with those documents which are attached to each loan file and were admitted into evidence, is sufficient to prove the element of knowledge required.

moneys. We see the difference in the degree of potential prejudice between nine counts and fifty to be diminutive.

## IV

In the third assignment of error, appellants contend[9] that the government failed in its duty to preserve certain exculpatory material in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1973) and that, as a result of this breach, the court erred in denying appellants' motion for judgment of acquittal notwithstanding the jury's verdict or, alternatively, for a new trial based upon the destruction of evidence.

Appellants' argument is based on the following facts. On Monday, April 20, 1981, at approximately 2:00 P.M. and during the trial of the appellants, Mahl played for John T. Mulvehill, the public defender who was representing him, a tape recording which was purported to be a conversation between Mahl and Toranto. During that conversation, Mahl allegedly told Toranto that he needed the loans to be rushed through because the purchase agreement on the properties was about to expire. Mulvehill encouraged Mahl to bring the tape to the attention of the court and parties in this case. Mahl did agree to play the tape for United States Attorney John Volz, but not for his assistants.

Mulvehill met with Volz at about 4:00 P.M. that same afternoon at which time he advised Volz of the contents of the tape and Mahl's offer that Volz be allowed to hear the tape. Volz stated that it would be unnecessary for him to hear the tape since Mulvehill had related the contents to him. Both men agreed that the court should be advised as to the existence of the tape and Volz stated that he would do so.

Shortly thereafter, Volz met with his assistants and the three of them then informed Judge Boyle of the existence of the tape. Judge Boyle advised Volz to contact Mulvehill and to have him attend a previously scheduled conference, which included appellants' attorneys, the next morning, Tuesday, April 21, 1981, at 8:30 A.M.

Appellants' attorneys were in the courthouse at the time of this initial conversation between Volz and Judge Boyle, but were not informed of the tape at that time.

At approximately 7:00 P.M. that same evening (April 20), appellants' attorneys, F. Irvin Dymond and Don M. Richard, received a call from Mahl. Mahl played the tape for Dymond and Richard and then indicated that, at that very moment, he was destroying the tape.

At trial, only Mahl was allowed to testify as to the contents of the tape.

On appeal, appellants argue that, by failing to immediately seek seizure of the tape or inform appellants' attorneys of the existence of the tape, the government breached its duty to preserve exculpatory material as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1973) and its progeny. This evidence, they argue, would have impeached Toranto who testified that Mahl told him the purpose of the loans was to renovate property.

*Brady v. Maryland, supra,* holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–1197. This due process consideration is based upon a realization of the vast resources of the prosecutor and on the desire to avoid an unfair trial to the accused. *United States v. Auten,* 632 F.2d 478, 480–

9. Appellants also contend that the government failed in its duty to inform defense counsel that Toranto lied concerning Mahl's statement as to the purpose of the loans. There is no evidence that the government possessed knowledge of Toranto's alleged lies. In addition, it is apparent from the record that defense counsel knew, perhaps better than the government, that Mahl

had contradicted his own story and would testify on the stand that he had told Toranto the true purpose of the loans. We find appellants' argument to be without merit. Under *Brady,* the government is not obligated to furnish a defendant with information which he already has. *United States v. Campagnuolo,* 592 F.2d 852 (5th Cir. 1979).

81 (5th Cir. 1975). *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 7631, 31 L.Ed.2d 104 (1972) applied the *Brady* doctrine to evidence useful for impeachment purposes if such evidence is shown to be material.

In *Calley v. Callaway,* 519 F.2d 184 (5th Cir. 1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976) we stated:

> The basic import of *Brady* is not that there is an abstract right on the part of the defendant to obtain all evidence possibly helpful to his case, but rather that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness.

*Id.* at 223.

■ There is little question that there are occasions where the prosecution has an affirmative duty to seek out evidence to which it has access and which may be beneficial to the defense. *Auten, supra.* In this case, it would appear that once Volz was informed of the existence of the tape, his *Brady* duty was triggered. Volz began to satisfy this duty when he informed the court of the tape shortly after its existence was revealed to him. *See United States v. James,* 495 F.2d 434 (5th Cir.), *cert. denied,* 419 U.S. 899, 95 S.Ct. 181, 42 L.Ed.2d 144 (1979) (notification of court sufficient to satisfy continuing discovery duty under Fed. R. Crim. P. 16(g)). His failure to immediately inform appellants' attorneys of the tape is justifiable considering his report to the court, the late hour of the day, that a meeting with appellants' attorneys was already planned for the next morning, and that neither Volz nor the court were aware that Mahl was contemplating the destruction of the tape. Therefore, we find that there was no dereliction of prosecutorial duty and that, as to the requirements of disclosure, *Brady* was satisfied.

■ However, our inquiry does not end here. After deciding that the government had satisfied its *Brady* duty, we must consider whether the destruction of the tape violated the principles of due process upon which *Brady* is based. "[L]ost evidence

cases are essentially permutations of failure-to-disclose cases." *Armstrong v. Collier,* 536 F.2d 72 (5th Cir. 1976). This court continued:

> An exception for good faith loss of important evidence must not be allowed to swallow the discovery rules, and the burden of explanation on the Government must be a heavy one; but criminal convictions otherwise based on sufficient evidence may be permitted to stand so long as the Government made "earnest efforts" to preserve crucial materials and to find them once a discovery request is made.

*Id.* at 78, quoting *United States v. Bryant,* 439 F.2d 642, 651 (D.C. Cir. 1971).

This circuit has recognized *Bryant's* good faith exception and has adopted its three-part test for determination of whether an indictment should be dismissed due to destruction or loss of evidence. The three factors are: (1) "the degree of negligence or bad faith on the part of the government"; (2) "the importance of the evidence lost"; and (3) "the evidence of guilt adduced at trial." *Armstrong, supra* at 78.

As to the first factor, we concluded above that, in light of the particular facts, the government satisfied its *Brady* duty and that no negligence or bad faith existed. The importance of the tape, in the context of the second factor, is questionable for two reasons. First the actual content of the tape is highly speculative. Neither the government prosecutors nor the court heard the tape. The only persons, other than Mahl, who heard the tape were appellants' counsel and Mulvehill, none of whom had ever before heard Toranto's voice. Second, at trial Mahl was allowed to fully relate and explain his conversations with Toranto. Because of these two reasons, we conclude that the tape was not so important that its destruction infringed upon appellants' due process rights. As to the third factor, we simply conclude that the evidence of guilt adduced at trial, including the 50 loan files and testimony of Mahl and Toranto was sufficient to prove the appellants' guilt and that the absence of the tape did not violate

·due process. The defense had access to Mahl prior to trial and was aware of his contention that Toranto knew the true purpose of the loans. During trial, the defense thoroughly explained the tape issue through its cross-examination of Mahl.

V

We will deal with appellants' fourth and fifth assignments of error together. In their fourth assignment of error, appellants allege that their conviction was supported largely by perjured testimony and that the character of said testimony was known by the government.[10] Their argument is based upon the contradiction of testimony of two government witnesses, Mahl and Toranto.

At the trial in question, Mahl testified that, when applying for the loans, he told Toranto the true purpose of the loans—to purchase property. Toranto testified that Mahl told him the purpose of the loans was to renovate property. Appellants contend that the testimony of Mahl plus the alleged contents of the Mahl/Toranto tape were sufficient to demonstrate that Toranto perjured himself and that the government had knowledge of such perjury. We do not agree.

First, there is no hard evidence that Toranto committed perjury. The Mahl/Toranto tape was destroyed before it could be heard by the government, authenticated, and, possibly, introduced at trial. The only evidence of perjury was in the conflict between the testimony of Mahl and Toranto. At most, this represented a contradiction in the testimony of two witnesses. Generally, the credibility of witnesses and the weight to be given to their testimony are questions within the province of the jury. *United States v. Martinez,* 588 F.2d 495 (5th Cir. 1979); *United States v. Kossa,* 562 F.2d 959 (5th Cir. 1975), *cert. denied,*

434 U.S. 1075, 98 S.Ct. 1265, 55 L.Ed.2d 781 (1978).

Second, assuming, arguendo, that Toranto had perjured himself, there is no evidence that the government had actual or constructive knowledge of the alleged perjury. In this case, such knowledge would be a prerequisite to reversal. *United States v. Barham,* 595 F.2d 231 (5th Cir. 1979); *United States v. Anderson,* 574 F.2d 1347 (5th Cir. 1978). In light of the destruction of the tape and of Mahl's testimony under oath when he entered his guilty plea on April 8, 1981, that he did not tell anyone at Homestead (except the Mirannes) the true purpose of the loans, no actual or constructive knowledge of perjury can be attributed to the government. In addition, even *if* Toranto had perjured himself and *if* the government had knowledge of the perjury, considering the events of trial, little or no prejudice can be attributed to such testimony. *See Anderson, supra.* Through Mahl, upon cross-examination, appellants' counsel fully explored Mahl's version of his dealings with Toranto and the alleged contents of the missing tape. We find no error in the fourth assignment.

The fifth and final assignment of error relates to the conviction of Appellant Miranne, Sr., of the perjury under counts 102 and 103 of the indictment. The perjury charges are based upon two separate statements made by Miranne, Sr., while under oath to examiners of the Federal Home Loan Bank Board (FHLBB).

The indictment specifically cited the following statements. On June 29, 1978, Miranne, Sr., testified as follows:

"Q. ... Have you ever had *any business dealings* with Mr. Mahl? Would you explain those dealings.

A. Yes, sir.

Q. Would you explain those.

---

10. Appellants also contend that, in the closing argument, the government improperly attempted to bolster the credibility of its witness, Toranto. Certainly, such action might be improper if the government attempted to bolster the credibility of a witness who, to the government's knowledge, had committed perjury. *United States v. Sanfilippo,* 564 F.2d 176 (5th Cir. 1977). However, in light of our discussion herein, such is not the case. Here there is no improper bolstering.

A. I will be glad to. Mr. Mahl is in the management business, also, of apartments—management and repairs of rental property. Our Association owned and took back over a half a million dollars worth of property over in Delmont Village on the West Bank. In Delmont Village I personally own 20 duplexes. This area became depressed after the fact the Christopher Homes moved into the area, and the entire area became black.

\* \* \* \* \* \*

Q. Did you have any other *financial transactions* with Mr. Mahl?

A. No, sir."

(emphasis supplied).

On October 4, 1979, Miranne, Sr., was again examined and the following dialogue took place:

"Q. Were you ever in any *dealings* with Mr. Mahl?

A. No.

Q. Who did he do—did he do anything for you?

A. Oh, deals? Let me take that back. Yes, Sir. Let me take that back. He managed—managed a—I owned 20 duplexes in Delmont Village, which I have owned, I think, for over ten years . . . .

\* \* \* \* \* \*

Q. Is that the only *deal* you got involved with Mahl?

A. That's all."

(emphasis supplied).

Appellant claims that the perjury convictions were based primarily on the allegedly perjured testimony of Toranto who provided the link between Mahl and the Mirannes in the loan transactions which gave rise to the substantive offenses in this case. Interestingly, appellant does not claim that Toranto's testimony concerning the relationship between Mahl and the Mirannes was perjured. Instead they argue that Toranto's testimony concerning this relationship was tainted by Toranto's allegedly perjured

statements about Mahl and the loan application. According to appellant, had the government exposed the alleged perjury by Toranto, he would have proven an unworthy witness on all factual issues. In light of our above discussion concerning the alleged perjury of Toranto, we find no merit to appellants' fifth assignment of error. This conclusion is further supported by the fact that the perjury conviction was supported by testimony of both Mahl and Toranto. Thus, there is not even a contradiction of testimony as there was in assignment four. In addition, the perjury conviction is supported by other sufficient documentary evidence which demonstrates the business relationship between Mahl and Miranne, Sr. In fact, much of the evidence at trial went to proving this relationship.

## VI

In conclusion, we find no sufficient grounds for reversal among appellants' five assignments of error and, thus, affirm the convictions of both appellants.

AFFIRMED.