SENTINEL COMMUNICATIONS COMPANY, a Delaware Corporation, Plaintiff-Appellant,

v.

Ben G. WATTS, Individually as the Secretary of the Department of Transportation of the State of Florida, Leonard R. Mellon, Individually as the Director for the Department of Highway Safety and Motor Vehicles of the State of Florida,

Betty Castor, in her capacity as Commissioner of Education of Florida Department of Education, Carl McCoy, in his official capacity as the Director of Division of Blind Services of the State of Florida, and T. Jack Bassett, in his official capacity as the Chief of the Bureau of Business Enterprises for the Florida Division of Blind Services, Defendants-Appellees.

No. 90-3601.

United States Court of Appeals, Eleventh Circuit.

July 26, 1991.

Lawrence J. Phalin, David C. Willis, Mateer, Harbert & Bates, P.A., Orlando, Fla., for plaintiff-appellant.

Walter M. Meginniss, Dept. of Legal Affairs, Tallahassee, Fla., for defendants-appellees.

Before FAY and EDMONDSON, Circuit Judges, and GARZA[*], Senior Circuit Judge.

FAY, Circuit Judge:

Plaintiff-appellant, a newspaper publisher, appeals a district court order denying its claims for declaratory and injunctive relief in connection with several Florida state agencies' manner of regulating the placement of its coin-operated newsracks at interstate rest areas. Because we agree that several aspects of Florida's unwritten "scheme" for regulating these devices are constitutionally suspect, we REVERSE the district court's order, and REMAND the case for further proceedings consistent with this opinion.

## I.

The facts of this case are undisputed by the parties. Plaintiff-appellant Sentinel Communications Company ("Sentinel"), is the publisher of *The Orlando Sentinel,* a daily newspaper of general circulation. In February 1987, Sentinel installed coin-operated newsracks in two public rest areas along Interstate 4 near Orlando, Florida. Soon thereafter, representatives of the Florida Department of Transportation ("DOT") removed the newsracks from the rest areas. The DOT officials left notes explaining that the DOT planned to remodel the rest areas and to build gift shops that would be staffed by the Division of Blind Services ("DBS") of the Florida Department of Education ("DOE"). In August 1988, when it appeared that the DOT's remodelling process would not be accomplished in the near future, Sentinel again placed newsracks in the rest areas. Once again, the newsracks were removed by DOT officials.[1]

In March 1989, Sentinel was advised by the DOT that the DBS had been granted authority to regulate distributors of news-

---

[*] Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. This time, the newsracks were removed with the explanation that the Florida Statutes prohibited the private or commercial use of public rest areas, including the sale or distribution of newspapers. *See* Fla.Stat. § 337.406 (1989) (declaring it "unlawful to make any commercial use of the right-of-way of any state-maintained road, including ... rest areas").

papers in public rest areas. Because Sentinel sought to distribute its newspaper via coin-operated newsracks (which are considered to be vending machines), it was required to apply to T. Jack Bassett, Chief of the Bureau of Business Enterprises for DBS, for permission to install them.

As the district court found, the Florida DBS derives its regulatory authority from state and federal law. As part of the Surface Transportation Assistance Act, Congress allows each state, pursuant to 23 U.S.C. § 111(b) (1988), to place vending machines in rest areas along the Interstate System. Section 111(b) instructs the states to grant priority to vending machines operated by the state licensing authority designated under the Randolph–Sheppard Act, 20 U.S.C. § 107 et seq. (1988), which, in Florida, is the DBS. *See* Fla.Stat. §§ 413.-011, 413.051 (1989). The Florida DOE, which administers the DBS, is under contract with the DOT. Pursuant to this agreement, the DOT has delegated to the DBS the authority to install vending machines in interstate highway rest areas, and to determine what may be sold in these machines. In December 1988, the agreement between the DOT and the DOE concerning vending machines in public rest areas was amended specifically to include newspapers as a commodity that may be sold in rest areas.

Accordingly, as instructed, Sentinel's Director of Circulation, Arthur Farber, contacted Jack Bassett regarding placement of Sentinel's newsracks at the two rest areas. Bassett informed Farber that other publishers were selling their newspapers in rest areas pursuant to contracts negotiated between the DBS and the newspaper organizations. Bassett stated that Sentinel could obtain a similar contract and install its newsracks if it agreed to pay a five cent administrative fee for each newspaper sold. When Farber objected that such an arrangement would infringe upon Sentinel's first amendment right to distribute newspapers, Bassett responded that Sentinel would not be permitted to distribute papers in public rest areas if it refused to pay the fee.

Despite Farber's objections, Bassett forwarded Sentinel a contract that Farber understood as "take it or leave it." The terms of the contract required Sentinel to pay an administrative fee on each newspaper sold, and to maintain a liability insurance policy for the newsracks. On May 18, 1989, Farber executed the contract and returned it to Bassett with an accompanying letter protesting the agreement. According to Farber, the letter advised Bassett of Sentinel's objection to the ability of Bassett, the DBS, the DOT and the DOE to prohibit the sale of newspapers in public rest areas. The letter also objected to the regulatory scheme promulgated by the DOT and the DOE as not constituting reasonable time, place and manner restrictions on the distribution of newspapers. The letter stated that Sentinel had signed the contract under duress in order to install its newsracks, informed Bassett that Sentinel was not waiving its first amendment rights, and indicated Sentinel's intention to pursue the matter in court. On May 24, 1989, Sentinel brought suit in federal district court.

In June of 1989, Farber had yet to hear from Bassett with regard to the executed contract. Farber called Bassett to inquire when Sentinel could begin installing its newsracks in the rest areas. According to Farber, Bassett informed him that he was very unhappy after reading Farber's letter, that he didn't feel a contract existed, and that he didn't have any desire to sign a contract in light of Sentinel's intention to sue. Bassett also later informed Farber that counsel for the DOE were suggesting contract revisions, and that Farber would hear something eventually.

Bassett forwarded a second contract to Farber on August 8, 1989, which Sentinel again executed and returned. The second contract was not signed by either Bassett or any representative of the DOE, but Bassett nevertheless permitted Sentinel to install its newsracks in the rest areas on Interstate 4 on September 12, 1989. Sentinel also installed newsracks in rest areas on Interstate 75 near Ocala. Bassett subsequently forwarded a third contract to Sentinel, which the latter executed on No-

vember 13, 1989, and returned. This contract was eventually executed on behalf of the DOE by Betty Castor, the Florida Commissioner of Education, on December 20, 1989. All of the newsracks in question have remained at the rest areas since their installation in September 1989, and according to Farber, Sentinel does not intend to put newsracks in any other rest areas.

No written rules or regulations govern Bassett in the exercise of his authority to grant or deny permission for a newspaper to install newsracks in public rest areas, nor are there procedures or standards in place that Bassett is obligated to follow when reviewing requests or applications by newspapers to install newsracks at rest areas.[2] Moreover, no written rules or regulations govern the amount that Bassett may charge for the right to distribute newspapers at the rest areas; he is free to negotiate independently the amount of the administrative fee with each newspaper with whom he deals.[3]

2. Bassett testified as follows:

Q: You testified earlier that you are the person that makes the decision whether a newspaper will be permitted in a rest area.

A: That's correct.

Q: Place its news rack in there.

A: That's correct.

Q: By having that authority you have the decision to grant them permission or not grant them permission; is that correct?

A: That's correct.

Q: Are there any written guidelines that you follow in making that decision whether a particular newspaper will or will not be allowed to place its news racks in a rest area?

A: No.

Q: None whatsoever?

A: None whatsoever.

Q: So it's basically left to your sole discretion as to whether they will be allowed to put their news racks?

A: Subject to the approval of the agency. The agreements still have to be reviewed and signed by the Department.

Q: If you say no, does it go any further?

A: Well, that depends. I'm at one level of government, and there is always a right to appeal anyone's decision. You know, as pointed out I've got someone I report to and that works on up through government.

Q: Is there any specific guidelines setting out this right to appeal?

A: There is no rule, however, I do think that there are Florida statutes dealing with the decisions made by public officials. I'm not an attorney, and I'm sure that there are appeal rights there in the statute.

(*Deposition of Jack Bassett*, R3–39 at 12–13).

3. Bassett testified as follows:

Q: All right. I'm going to come back to the insurance a little bit later, but let's go on to the—All right, let's go on to the other items that are negotiable for just a moment. You said the fee is negotiable?

A: Uh-huh.

Q: Is there a minimum—

MR. MEGINNISS: Are you saying yes or no?

A: Yes.

MR. MEGINNISS: Okay.

Q: Is there a minimum fee which must be charged to the newspaper?

A: No.

Q: I'm sorry?

A: No.

Q: Okay. Is that a written policy someplace?

A: No.

Q: If a paper came to you and proposed not to pay you anything, would you allow them to distribute their newspaper?

A: No.

Q: You would not?

A: No.

Q: So you're telling me there is some sort of a minimum fee then that must be paid?

A: Yes.

Q: What is that minimum fee, sir?

A: That's negotiable, I just stated that.

Q: In other words, you're going to try and get as much as you can get?

A: No, that's not correct.

Q: All right. Then will you permit a newspaper to put its news racks in if it wants to pay a licensing fee of less than five cents a paper?

. . . .

A: Okay, the amount that is agreed to is agreed to by mutual consent. And in the case of the USA Today, which was the first paper, we had determined that they were remitting to another state five cents per copy and that they were pleased with that and they felt that that was fair and appropriate for general administration and overhead and so forth that are associated with making that service available through the state and that at the same time they were looking at an alternate method which was more complicated and—

. . . .

Q: Would you permit a newspaper to place its news racks in the rest areas if it wanted to remit to you less than five cents per paper? That is a simple yes or no answer.

A: Well, if you want—Yes.

Q: Do you know how much less?

The actual agreement executed between the DOE (on behalf of the DBS) and Sentinel contains a provision requiring Sentinel to pay a five-cent administrative fee for each newspaper sold. The fee is intended to compensate the DBS for the cost of administering the agreement and inspecting the vending machines. Bassett performed no independent cost studies before setting the fee to be charged. Instead, he conversed with transportation officials in other states who recommended a fee of five cents. In his deposition, Bassett testified that he did not know how much it had cost the DBS to administer Sentinel's contract to date, but that he believed that the costs of administration outweighed the cost of the fee.[4]

The contract also requires Sentinel to provide liability insurance up to the statutory limits of the DOT's liability—$100,000 per person and $200,000 per incident. Evidently, the insurance requirement is not negotiable, and Bassett testified that he would deny permission to install newsracks for any newspaper that did not provide insurance. Although the insurance provision is present in other contracts with news organizations, Bassett does not require vendors such as Coke or Pepsi to provide insurance as a prerequisite to installing their vending machines in rest areas.

Sentinel's contract may be cancelled by either party for any reason upon thirty (30) days written notice. According to Bassett, he would cancel the contract only if sufficient reason existed, such as Sentinel's failure to comply with the contract, the DOT's closing of the rest areas in which Sentinel distributed its newspaper, or Sentinel's failure to provide continuous daily service.

Sentinel brought suit in the United States District Court for the Middle District of Florida seeking declaratory and in-

---

A: It would depend.
(*Deposition of Jack Bassett*, R3–39 at 19–21).

4. Bassett testified as follows:
  Q: Do you know how much it cost to administer any of the contracts?
  A: I know that our costs exceed the small amount of the fee.
  Q: Forgive me. If you don't know how much they cost, how do you know they exceed what you are collecting?
  A: Because I know what our people's salary are. I know what the time and travel costs are for those people. We do not allocate their cost back to what it cost to serve a Coke or what it cost to serve a—it's of no significance to us to allocate that cost back. We're not attempting to fully cost these. It's only a fair, what we believe is a fair fee, and it's been agreed to.
  Q: You say the five cents per paper charge is just what you believe is a fair fee?
  A: It's a mutual contract.
  Q: A mutual—
  A: Two parties signed it.
  Q: Okay. So you didn't do any research in advance before coming up with that five-cent charge?
  A: Yes, I did.
  Q: Okay. What did you do?
  A: I contacted some states that were placing, had either placed or were working with newspapers on the interstates. It's a relatively new undertaking.
  . . . .

Q: Did you review any of your own costs in arriving at the five-cent per copy charge?
  A: We knew that our cost would exceed any, exceeded the five cents a copy that we found out. We felt that we wouldn't ask for more than that, but we would be receptive if someone wanted to offer.
  Q: Who is we? Did someone else participate in this decision with you?
  A: We discussed the, when I say we, in negotiating the agreement with USA Today, that was a discussion that came up within my office which would be myself. Our division director then, who is retired, did not set the fee but he was aware of the five cents per copy; and also our general counsel didn't advise anyway on the fee but they knew that that's an administrative decision not a legal decision so they didn't tell us to set it at any particular amount. But we did determine that we could assess a fee.
  Q: Did you make any notes or memoranda at all about the fee to be charged?
  A: No.
  Q: Are there any rules or regulations that govern the amount that you can charge?
  A: No.
  Q: After the Sentinel's contract expires in June, is there any reason why you could not insist upon say 20 cents a copy?
  A: We have no plans to do that.
  Q: Okay. Is there any reason why you could not insist upon 20 cents a copy?
  A: No.
(*Deposition of Jack Bassett*, R3–39 at 64–69).

junctive relief[5] against defendants-appellees Watts, Mellon, Castor, McCoy and Bassett in their various official capacities with the DOT, the DOE, and the DBS. The suit challenged as unconstitutional 23 U.S.C. § 111(b), to the extent that it granted officials of the state of Florida "unfettered and uncontrolled discretion" to dictate the terms and conditions of Sentinel's exercise of its first amendment right to distribute its newspaper in an alleged traditional public forum.[6]

The district court refused to rule on the constitutionality of 23 U.S.C. § 111(b), and found that no live controversy existed. The only provisions to which the court found Sentinel subject and able to contest were the conditions of its contract with the DBS, namely, the five-cent administrative fee and liability insurance requirements. The court found both of these provisions to be reasonable, and therefore, constitutional. Sentinel now appeals the district court's denial of its claims for declaratory and injunctive relief.

## II.

On appeal, Sentinel asks us to consider whether Florida's manner of regulating the installation of Sentinel's newsracks at interstate rest areas, pursuant to authority delegated by the Surface Transportation Assistance Act, 23 U.S.C. § 111(b), is unconstitutional as a prior restraint on the exercise of Sentinel's first amendment rights.

## A.

■ Preliminarily, we wish to clarify that, to the extent that Sentinel's objections to Florida's unwritten regulatory scheme have been cast in the form of a facial or an as-applied challenge to the constitutionality of section 111(b), either such challenge is slightly misplaced.

The gist of Sentinel's constitutional attack on section 111(b) is that the statute vests Florida state officials with unbridled discretion to regulate the distribution of its newspapers through newsracks—an allegedly protected first amendment activity—at interstate rest areas. In this regard, Sentinel relies chiefly upon *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), in which the Supreme Court held unconstitutional a Lakewood, Ohio licensing ordinance that vested the Mayor of Lakewood with unbridled discretion to approve or deny applications for annual permits to place coin-operated newsracks on city sidewalks, provided that the Mayor stated the reasons for any denial. Sentinel urges that in the instant case, "23 U.S.C. § 111(b) and the unwritten regulatory scheme adopted by Defendants suffer from the same constitutional defects as the Lakewood ordinance, but to a greater degree," because the Chief of the Bureau of Business Enter-

---

**5.** Sentinel's amended complaint also contained a claim for money damages under 42 U.S.C. § 1983. The district court ruled this claim barred on the strength of *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989) and *Welch v. Texas Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 472–74, 107 S.Ct. 2941, 2945–46, 97 L.Ed.2d 389 (1987) (plurality opinion). Because suits against state officials in their official capacities are deemed to be suits against the state, the district court found that Sentinel's damages claim was against the State of Florida, and that Florida has not waived its eleventh amendment immunity to Section 1983 suits in federal court. *See Gamble v. Florida Dep't of Health & Rehab. Servs.,* 779 F.2d 1509 (11th Cir.1986). Sentinel has not appealed the district court's ruling as to this claim, and we therefore need not address it.

**6.** The suit also challenged Florida Statute § 337.406 as applied to prohibit Sentinel from installing its newsracks in public rest areas along the interstate highway system in Florida. The district court declared the issue moot because the subsequent contract between Sentinel and the DBS had changed the DOT's policy regarding enforcement of the statute. Sentinel appealed this ruling, arguing that even if its challenge to 23 U.S.C. § 111(b) were accepted, i.e. if the DBS were enjoined from regulating the newsracks, Sentinel's installation of newsracks could still be prohibited by the DOT (as before) as violative of section 337.406.

Because section 337.406 has since been recently amended by the Florida legislature such that its coverage no longer appears to extend to interstate rest areas, *see* Fla.Stat. § 337.406 (Supp.1990), Sentinel now agrees that the constitutionality of the statute is no longer at issue in this case.

prise for the DBS, Jack Bassett, has unbridled discretion to approve or deny a newspaper permission to distribute newspapers via newsracks in a public rest area. *Initial Brief of Appellant* at 14–15.

We agree that the concerns expressed by the Supreme Court in *Lakewood* are important in considering the validity of the DBS's method or scheme of authorizing the placement of newsracks at interstate rest areas, and we do so *infra.* An attack on 23 U.S.C. § 111(b), however, is not appropriate.

Section 111(b) is merely a delegating statute, generally granting to individual states the authority to "permit the placement of vending machines in rest and recreation areas, and in safety rest areas, constructed or located on rights-of-way of the Interstate System in such State." Should an individual state decide to allow placement of vending machines at interstate rest areas, the statute then requires that state to give priority to vending machines operated through the state licensing agency designated pursuant to section 2(a)(5) of the "Randolph–Sheppard Act," codified at 20 U.S.C. § 107a(a)(5) (1988); in Florida, this agency is the DBS.

In this regard, although the Florida DBS's method of permitting the placement of newsracks appears to be problematic and constitutionally infirm, Section 111(b) itself does not purport to authorize *any* type of scheme, discretionary or not, for the substantive regulation of vending machines at interstate rest areas. Contrary

to Sentinel's characterization, Congress's decision to delegate to the states the *power* to permit the placement of vending machines (including newsracks) at interstate rest areas implies nothing about how or even whether the state should do so.[7]

### B.

The proper focus is instead on whether Florida's ill-defined "scheme" for permitting the placement of newsracks is violative of Sentinel's first amendment rights. In addressing this question, we determine first whether the activity that the Florida DBS seeks to regulate, *i.e.* Sentinel's distribution of its newspaper through newsracks, is indeed activity protected by the first amendment. We then evaluate the constitutional validity of DBS's system for permitting newsracks at rest areas in light of the concerns and principles articulated by the Supreme Court with respect to the presence of unfettered discretion in regulating first amendment activity.

First, our circuit has joined an increasingly lengthy body of Supreme Court and federal precedent emphasizing that there is "no doubt" that the right to distribute and circulate newspapers through the use of newsracks is protected by the first amendment. *See Miami Herald Pub. Co. v. City of Hallandale,* 734 F.2d 666, 673 (11th Cir.1984); *see, e.g. Lakewood,* 108 S.Ct. at 2145, 2150; *Gannett Satellite Info. Network v. Metropolitan Transportation Auth.,* 745 F.2d 767, 772 (2d Cir.

---

7. Put another way, a general delegation of congressional authority in this instance is a grant of discretion only in the sense that it leaves it to the states to determine if and how they will oversee the placement of vending machines in areas normally subject to federal control. Pursuant to this grant of authority, the state may then choose to implement some type of licensing scheme, ordinance or statute in order to regulate the placement of vending machines. If the state has chosen to implement a scheme that impinges upon protected First Amendment interests, as Sentinel has alleged in this case, by vesting unbridled discretion in a government official over whether to permit or deny expressive activity, that scheme may of course be challenged on both facial and as-applied bases. The actual "vesting" of "unbridled discretion," however, as it refers to the substantive regula-

tion and placement of vending machines is effectuated by the state's licensing scheme, statute or ordinance, NOT by the general statute authorizing state regulatory activity in this area. In short, section 111(b) is not a licensing statute; the proper challenge is to the state's regulatory scheme.

The point is illustrated by way of rough analogy to the scenario confronted by the Supreme Court in *Lakewood.* The facial challenge upheld by the Court was to a City licensing ordinance granting the Mayor unfettered discretion to deny permit applications; the newspaper there, however, did not challenge the City charter provisions or state statute that presumably gave the City the general power to pass ordinances or make laws pertaining to the placement of structures on municipal streets.

1984); *Jacobsen v. Petersen,* 728 F.Supp. 1415, 1419 (D.S.D.1990); *Gannett Satellite Info. Network v. Berger,* 716 F.Supp. 140, 146 (D.N.J.1989), *aff'd in part and rev'd in part on other grounds,* 894 F.2d 61 (3rd Cir.1990); *Gannett Satellite Information Network, Inc. v. Township of Pennsauken,* 709 F.Supp. 530, 535–36 (D.N.J.1989); *Chicago Tribune Co. v. City of Chicago,* 705 F.Supp. 1345, 1347 (N.D.Ill.1989); *Chicago Newspaper Publishers v. City of Wheaton,* 697 F.Supp. 1464, 1466 (N.D.Ill. 1988); *Gannett v. White,* 14 Med.L.Rptr. 2037, 2040 (BNA) (N.D.N.Y.1987); *Gannett Satellite Info. Network Inc. v. Town of Norwood,* 579 F.Supp. 108, 114 (D.Mass. 1984); *Providence Journal Co. v. City of Newport,* 665 F.Supp. 107, 110 (D.R.I.1987); *Miller Newspapers, Inc. v. City of Keene,* 546 F.Supp. 831, 833 (D.N.H.1982); *Southern New Jersey Newspapers, Inc. v. New Jersey Dep't of Transp.,* 542 F.Supp. 173, 183 (D.N.J.1982); *Philadelphia Newspapers, Inc. v. Borough Council,* 381 F.Supp. 228, 241 (E.D.Pa.1974). *But see Lakewood,* 108 S.Ct. at 2155 (White, J., dissenting). There is therefore little question in this case that Sentinel's distribution of the *Orlando Sentinel* via newsracks is constitutionally protected activity.

■ Sentinel urges that Florida's system of permitting the placement of newsracks at interstate rest areas is facially unconstitutional as a prior restraint, because it subjects the constitutionally protected distribution of its newspapers through newsracks to the standardless, unfettered discretion of Florida state officials. We believe that this challenge has merit.

First, in acknowledging Sentinel's facial attack on Florida's unwritten scheme, we also acknowledge that the law generally does not favor such challenges. Nevertheless, facial challenges "have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990). It is well-established that in the area of freedom of expression, one has standing to challenge a statute or scheme "on the ground

that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and *whether or not he applied for a license.*" *Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965) (emphasis added). Thus, the Supreme Court in *Lakewood* observed that its "cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *Lakewood,* 108 S.Ct. at 2143 (footnote and citations omitted).

■ In the instant case, for the same reason, it is likewise immaterial for purposes of a facial challenge that Sentinel's newsracks are currently in place at the rest areas in question, *i.e.* that Sentinel has been permitted to place its newsracks by signing a contract with the DOE. Sentinel has challenged the constitutionality of the DBS's permit scheme on its face, and has demonstrated that the scheme vests state officials with the unchanneled discretion to decide how and whether newsracks should be placed at rest areas—"and that is all it has to do. In a facial challenge such as this, the facts of the challenging party's case are irrelevant." *City of Hallandale,* 734 F.2d at 674 n. 4 (citing *Beckerman v. City of Tupelo, Mississippi,* 664 F.2d 502, 506–07 (5th Cir. Unit A 1981)). "A court may invalidate an excessively broad grant of discretion on its face, without regard to the particular facts of the plaintiff's case, because the very existence of the discretion lodged in the public official is constitutionally unacceptable." *Fernandes v. Limmer,* 663 F.2d 619, 625 (5th Cir. Unit A 1981), *cert. denied,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982) (citation omitted). By facially invalidating broad grants of discretion, the Supreme Court "has revealed that the problem is not potential abuses but the very existence of broad, censorial power." *International Soc'y for*

*Krishna Consciousness v. Eaves,* 601 F.2d 809, 823 (5th Cir.1979) (footnote omitted).[8]

In *Lakewood,* the ordinance at issue vested the Mayor with ultimate authority to grant or deny applications for annual permits to place newsracks on public property. If the application was denied, the Mayor was required to state reasons for the denial; if granted, a permit would issue subject to conditions expressed in the ordinance as well as "any 'other terms and conditions deemed necessary and reasonable by the Mayor.'" *Lakewood,* 108 S.Ct. at 2142 (footnote omitted).

On these facts, the Supreme Court held a facial challenge appropriate for two reasons. "First, the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* at 2144. Thus, as the Court noted, it is not difficult to envision a newspaper, dependent upon a public official for its right to distribute in certain areas, refraining from criticism in order to receive a favorable or speedy resolution of its permit application. *Id.* "Only standards limiting the licensor's discretion will eliminate this danger by adding an element of certainty fatal to self-censorship." *Id.* (citation omitted).

The second related concern identified in *Lakewood* as justifying a facial challenge addressed the absence of express standards. Such an absence "makes it difficult to distinguish, 'as applied,' between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power." *Id.* The Court reasoned:

> Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any

particular case whether the licensor is permitting favorable, and suppressing unfavorable expression.... In sum, without standards to fetter the licensor's discretion, the difficulties of proof and the case-by-case nature of "as applied" challenges render the licensor's action in large measure effectively unreviewable.

*Id.* (citations omitted).

▆ With these two concerns forming the "heart" of its test, the Court determined that facial challenges may be maintained 1) whenever a government official or agency has been given substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers; and 2) when there is present a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks. *See id.* at 2145. In examining the DBS's method of permitting the placement of newsracks at interstate rest areas, we believe that both criteria announced by the Court in *Lakewood* are present.

As mentioned, pursuant to a general grant of authority under 23 U.S.C. § 111(b), Florida may permit the placement of vending machines, including newsracks, at interstate rest areas; the licensing authority in the state that oversees such placement is the DBS. Other than this skeletal framework, however, Florida's "scheme" or "system" for regulating the placement of newsracks at the rest areas is completely unwritten, and indeed, seems completely concentrated in the person of Jack Bassett, Chief of the Bureau of Business Enterprises for the DBS. Unaided (or unhindered) by any regulations, guidelines, procedures, ordinances, or standards, Bassett receives requests or applications from newspapers, and negotiates independently with each publisher that contacts him. There are no grounds for granting or denying permits; our review of the record indicates that Bassett is free to make his decisions on any basis that he deems appropri-

---

**8.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

ate, and (unlike the Mayor in *Lakewood*) nothing requires him to justify his reasons for denying a newspaper the right to distribute in rest areas.

Once a decision is made to allow newspaper distribution, Bassett is apparently also free to impose contractually his own terms upon the newspapers, including the administrative fee or liability insurance requirements, and has testified that he would deny access to newspapers that failed to comply with such requirements. Additionally, because Bassett is free to negotiate different contracts with different newspapers, there is no assurance that newspapers are treated equally or according to uniform criteria. Finally, the agreement between the DOE and Sentinel negotiated by Bassett specifies that either party can cancel the agreement simply upon thirty days notice; in effect, Bassett can revoke permission to place a newsrack at a rest area for any reason at all, as long as he provides thirty days notice to Sentinel.

In short, as it stands now in Florida, newspapers seeking permission to distribute their newspapers through newsracks at interstate rest areas appear to be subject to the completely standardless and unfettered discretion of one bureaucrat working for the DBS in Tallahassee.[9] We agree that, given the principles expressed by the Court in *Lakewood* and elsewhere, such a scenario seems facially unacceptable and constitutionally infirm. "[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship." *Lakewood*, 108 S.Ct. at 2147; *cf. also NAACP v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir.1984) ("Such discretion grants officials the power to discriminate and raises the spectre of selective enforcement on the basis of the content of speech.").[10]

Like the Supreme Court in *Lakewood*, we believe that some minimal procedures and standards are required here to channel the discretion of DBS officials.[11] Some neutral criteria must be established in order to insure that the DBS's permit decision regarding newsracks "is not based

---

**9.** We do not suggest here that Bassett and the DBS thus far have negotiated with Sentinel and other newspaper publishers in anything other than good faith; apparently, every newspaper that has applied for permission has been granted access to the rest areas, provided that it complied with contractual requirements such as the administrative fee and liability provisions. Nevertheless, in the unique context of first amendment challenges upon the facial validity of licensing or permit schemes, "it is the very existence of official discretion that gives rise to a threat of injury sufficient to warrant an injunction." *City of Hallandale*, 734 F.2d at 674–75 n. 4 (citations omitted). Indeed, this is the precise reason for a facial approach:

> [I]f the Court were concerned merely about officials' abusing their wide discretion, it need not have chosen this facial approach; it could have struck down the abuses when they arose. (citation omitted). By facially invalidating excessively broad grants of discretion, then, the Court has revealed that the problem is not potential abuses but the very existence of broad, censorial power.

*International Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 823 (5th Cir.1979) (footnote omitted). Thus, the doctrine forbidding unbridled discretion requires reasonable and definite standards; it is not enough to presume that officials will act in good faith and adhere to standards absent from a statute or scheme's face. Implicit limits on a licensing official's discretion must be made explicit, "by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood*, 108 S.Ct. at 2151 (citations omitted); *cf. Invisible Empire of the Knights of the Ku Klux Klan v. Mayor of Thurmont*, 700 F.Supp. 281, 285 (D.Md.1988) (unconstitutional prior restraint found where no ordinances, regulations, or well-established practice existed to guide town's Board of Commissioners in decisions of whether to grant or deny parade permits).

**10.** Indeed, even in a scenario where the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, that is, ban a particular kind of speech entirely, it still "may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." *Lakewood*, 108 S.Ct. at 2147 (emphasis in original).

**11.** Our holding *infra* that rest areas along the interstate system are nonpublic fora does not eliminate the constitutional requirement of standards for discretionary licensing. It may, however, require that any regulations or standards promulgated by the DBS or other agencies be reviewed only for reasonableness instead of some higher level of scrutiny. *See New York News, Inc. v. Metropolitan Transp. Auth.*, 753 F.Supp. 133, 140 (S.D.N.Y.1990); *infra* at III.B.

on the content or viewpoint of the speech being considered." *Lakewood,* 108 S.Ct. at 2145. Because the district court never dealt with Sentinel's facial attack on the permit scheme at issue,[12] we accordingly REVERSE and REMAND this claim for a full evidentiary hearing and complete findings of fact and conclusions of law by the district court.

## III.

We now consider whether the administrative fee and liability insurance requirements that apparently attend the DBS's regulation of the placement of Sentinel's newsracks at interstate rest areas are unconstitutional prior restraints on Sentinel's first amendment rights. In so doing, we utilize the Supreme Court's conventional "public forum" analysis in order to determine the proper level of first amendment scrutiny to be applied to such restrictions.

As mentioned, Sentinel's distribution of newsracks is constitutionally protected activity. Nevertheless, the Supreme Court has also observed "that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981). "Even protected speech is not equally permissible in all places at all times." *Cornelius v. NAACP Legal Defense & Ed. Fund,* 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). Moreover, the first amendment does not automatically bestow access to property simply because it is owned or controlled by the government. *United States Postal Service v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the

---

**12.** The district court apparently mischaracterized the nature of Sentinel's challenge to the appellees' unbridled discretion as an "as applied" challenge, and then went on to find as follows:

> The Sentinel entered a contract with the DOE which permits it to sell newspapers in the same manner it previously desired to sell newspapers: through its newsracks in the rest areas. The Sentinel currently sells its newspapers in the rest areas. As a result, the Sentinel is no longer subject to the DBS's discretion respecting its ability to deny access to the rest areas. Because the DBS and the DOE have complied with the Sentinel's demands and have established a policy of compliance in the future, the Sentinel presents no live controversy respecting its request to declare 23 U.S.C.A. § 111 unconstitutional or to enjoin defendants from removing its newsracks in the future.

(*Order,* June 15, 1990, R2–50 at 12). Our review of the record indicates that Sentinel has consistently challenged not only section 111(b), but *Florida's unwritten regulatory scheme* as facially unconstitutional. Thus, Sentinel did not forfeit or otherwise waive its right to bring a facial challenge by entering into a contract with the DOE, or by having its newsracks placed at the rest areas. Once again, in First Amendment cases, one may facially challenge a statute or scheme that delegates overly broad discretion *whether or not* he has applied for a license. *See Lakewood,* 108 S.Ct. at 2143; *City of Hallandale,* 734 F.2d at 674 n. 4.

In addition, we are puzzled by the district court's conclusion that Sentinel is no longer subject to the DBS's discretion to deny access simply because Sentinel is currently selling in the rest areas. The agreement between the DOT and the DOE, as well as the contract between Sentinel and the DOE provide that the relationship may be terminated by either party *without* cause after proper notice. In spite of its contract, Sentinel obviously remains dependent on the appellees' discretion to continue distributing its newspaper at the rest areas, particularly since there are no guidelines or written rules to govern or limit the exercise of discretion in terminating Sentinel's contract.

Moreover, much like the periodic renewal requirement that the Supreme Court considered a troubling feature of the regulatory scheme at issue in *Lakewood* (a provision which is also contained in the agreement between Sentinel and the DOE), the termination provision here is "sufficiently threatening to invite judicial concern," *Lakewood,* 108 S.Ct. at 2145, because the fear that the licensor can insulate his permit decision from review is the same. Knowing that its speech (here newspaper distribution) is essentially terminable at will, "[a] speaker in this position is under no illusion regarding the effect of the 'licensed' speech on the ability to continue speaking in the future. Yet demonstrating the link between 'licensed' expression and the denial of a later license [or the termination of a present one] might well prove impossible." *Id.*

disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799–800, 105 S.Ct. at 3447–3448. The Government, like any private landowner, may " 'preserve the property under its control for the use to which it is lawfully dedicated.' " *U.S. v. Gilbert*, 920 F.2d 878, 884 (11th Cir.1991) (quoting *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966)).

With regard to the protected activity at issue here, we are inclined to agree "that the First Amendment protections afforded to newsracks are not boundless." *Gannett Satellite Info. Network v. Berger*, 716 F.Supp. at 147. "The existence of a right of access to public property and the standard by which limitations on such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Thus, the extent to which the DBS may restrict Sentinel's ability to distribute its newspapers through newsracks in this case depends on how interstate rest areas are analyzed under the rubric of the Court's public forum doctrine. *See Gannett Satellite Info. Network v. Metropolitan Transp. Auth.*, 745 F.2d at 772 (citing *Perry*, 460 U.S. at 44, 103 S.Ct. at 954); *International Caucus of Labor Comms. v. Metropolitan Dade County, Florida*, 724 F.Supp. 917, 921 (S.D.Fla.1989). In public fora, either traditional or designated, the Supreme Court has held that regulations of the time, place, and manner of protected expression must be content-neutral, be narrowly tailored to serve a significant governmental interest, and allow for sufficient alternative channels of communication. *Community for Creative Non–Violence v. Turner*, 893 F.2d 1387, 1390 (D.C.Cir.1990) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989)). In nonpublic fora, however, such regulations will be upheld as long as they are reasonable and viewpoint neutral. *Id.* (citing *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966)); *see U.S. v. Belsky*, 799 F.2d 1485, 1489 (11th Cir.1986) (citation omitted).

## A.

The Supreme Court has adopted a forum analysis in order to determine "when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. Hence, the Court uses a now-familiar tripartite conceptual framework, first announced in *Perry*, in order to determine how first amendment interests are to be analyzed with respect to Government property. *U.S. v. Kokinda*, —— U.S. ——, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990).

■ At one end of the continuum lie the so-called "traditional" or "quintessential" public fora. These are places that "by long tradition or by government fiat have been devoted to assembly and debate," and the classic examples of such fora are public streets and parks. *Perry*, 460 U.S. at 45, 103 S.Ct. at 954; *see Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"); *see also United States v. Grace*, 461 U.S. 171, 179, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983) (public sidewalks recognized as traditional public forum property). The rights of the State to limit expressive activity on governmental property that has been traditionally open to the public for expressive activity are "sharply circumscribed," *Perry*, 460 U.S. at 45, 103 S.Ct. at 954, and any attempt by the State to do so therefore is examined under strict scrutiny. *Kokinda*, 110 S.Ct. at 3119. "Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. In traditional public fora, the State may also enforce restrictions of the time,

place and manner of expression, as long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Perry,* 460 U.S. at 45, 103 S.Ct. at 954.

A second type of public forum, sometimes known as the "designated" or "limited" public forum, "may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 (citing *Perry,* 460 U.S. at 45, 46 n. 7, 103 S.Ct. at 954, 955 n. 7); *see, e.g. Widmar v. Vincent,* 454 U.S. 263, 267, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981) (state university meeting facilities); *Madison Joint School Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 174 n. 6, 97 S.Ct. 421, 426 n. 6, 50 L.Ed.2d 376 (1976) (school board meetings); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975) (municipal auditorium and city-leased theater). A public forum created by government designation thus consists of public property that the State has opened for expressive activity. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. Accordingly, the touchstone for determining whether property is a designated public forum is government intent in establishing and maintaining the property. *Stewart v. District of Columbia Armory Bd.,* 863 F.2d 1013, 1016 (D.C.Cir.1988) (citing *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449). In attempting to divine whether the government has intended to designate as a public forum a place not traditionally open to assembly and debate, the Supreme Court has considered factors such as the policy and practice of the government, the nature of the property, and its compatibility with expressive activity. *See Cornelius,* 473 U.S. at 802–03, 105 S.Ct. at 3448–49. The Court has stated that it "will not find that a public forum has been created in the face of clear evidence of a contrary intent." *Id.* at 803, 105 S.Ct. at 3449 (citation omitted). Neither should courts "infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Id.* "Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. Hence, "[r]egulation of speech on property that the Government has expressly dedicated to speech activity is also examined under strict scrutiny." *Kokinda,* 110 S.Ct. at 3119.

"Not every instrumentality used for communication, however, is a traditional public forum or a public forum by designation." *Cornelius,* 473 U.S. at 803, 105 S.Ct. at 3449 (citing *Council of Greenburgh Civic Assns.,* 453 U.S. at 130 n. 6, 101 S.Ct. at 2685 n. 6).[13] Once again, the first amendment does not guarantee access to property simply because it is owned or controlled by the government. *Id.* The third category of the Court's conceptual framework is therefore the nonpublic forum, defined in the negative as "[p]ublic property which is not by tradition or designation a forum for public communication." *See Perry,* 460 U.S. at 46, 103 S.Ct. at 955. In nonpublic fora, where the Government has not dedicated its property to first amendment activity, regulation of such activity is examined only for reasonableness. *Kokinda,* 110 S.Ct. at 3119–20 (citation omitted). "In addition to time, place and manner regulations, the State may reserve [a nonpublic] forum for its intended purposes, communicative or otherwise, as long

---

**13.** Indeed, Justice Blackmun emphasized this point in the plurality opinion of *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974):

Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require. *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974).

as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955 (citation omitted).

■ Interstate rest areas, like interstate highways, are relatively modern creations developed in conjunction with the federal government as part of the National System of Interstate and Defense Highways—"so named because of its primary importance to the national defense and hereafter referred to as the 'Interstate System.'" 23 U.S.C. § 101(b) (1988). With regard to the Interstate System as a whole, Congress has declared:

> [The Interstate System] shall be so located as to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers, to serve the national defense, and to the greatest extent possible, to connect at suitable border points with routes of continental importance in the Dominion of Canada and the Republic of Mexico.

23 U.S.C. § 103(e)(1) (1988). The result has been the creation of a surface transportation system that permits traffic to flow over long distances without the many interruptions occasioned by speed reductions through towns, villages and smaller cities. The System is clearly one of limited access that cannot be altered without prior federal approval; automotive service stations, for example, as well as other commercial establishments for serving motor vehicle users, may not be constructed or located on the rights-of-way of the Interstate System. 23 U.S.C. § 111(a) (1988). It only makes sense that, as part of this grand System, provision is made for the weary or "saddlesore" traveler. Thus, a safety rest area is defined as "[a] roadside facility safely removed from the traveled way with parking and such facilities for the motorist deemed

necessary for his rest, relaxation, comfort and information needs." Landscape and Roadside Development Guidelines, 23 C.F.R. § 752.3(a) (1990).

Although arguing that rest areas are "traditional" public fora, Sentinel does not appear to be analytically precise in arguing whether the forum at issue is a traditional public forum or a public forum by designation. As components of the Interstate System, safety rest areas are hardly the kind of public property that has "by long tradition or by governmental fiat ... been devoted to assembly and debate." *Perry*, 460 U.S. at 45, 103 S.Ct. at 954. They have not "immemorially been held in trust for the use of the public," and have not, "time out of mind," "been used for purposes of assembly." *Hague*, 307 U.S. at 515, 59 S.Ct. at 964. Indeed, as modern phenomena, rest areas have never existed independently of the Interstate System; they are optional appendages that are intended, as part of the System, to facilitate safe and efficient travel by motorists along the System's highways. At the outset, then, it seems clear to us that rest areas are nontraditional fora.

This distinction, however, is not crucial because it alone does not refute Sentinel's contention that safety rest areas should be *treated as* traditional public fora, *i.e.* that in creating such havens at intervals along the System, the government has intentionally *designated* or opened these nontraditional fora to public discourse and expressive activity. If this is the case, state attempts to regulate the expressive activity would still be subject to strict scrutiny.[14]

Thus, in considering the nature of the forum at issue, Sentinel points out that topographical features of rest areas frequently resemble those found in city parks, *e.g.* grassy areas, restrooms, water foun-

---

**14.** *Cf. International Caucus of Labor Comms. v. Dade County,* 724 F.Supp. at 923. In considering the nature of Miami International Airport for purposes of public forum analysis, the district court observed:

> Most courts considering the nature of a municipal airport terminal conclude that it is a public forum without clearly stating whether it holds the terminal to be a "traditional" or

"designated" public forum. However, it is not a crucial distinction for the purpose of this Court's analysis because the standards governing the state's ability to restrict expressive activity are the same whether the public forum is a traditional or designated one. *Id.* (citing *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–955).

tains, parking areas, picnic benches. On this basis, Sentinel argues that a rest area is the interstate highway equivalent of a city park and, therefore, is a public forum. Although the argument has some intuitive appeal, we are not persuaded.

First, the Supreme Court has held that "[t]he mere physical characteristics of the property cannot dictate forum analysis." *Kokinda*, 110 S.Ct. at 3120; *see also Greer v. Spock*, 424 U.S. 828, 835–37, 96 S.Ct. 1211, 1216–17, 47 L.Ed.2d 505 (1976) (where presence of sidewalks and streets within military base did not require finding that base was a public forum). More important, there is evidence which suggests that, despite the superficial resemblance between rest areas and municipal parks, the government did *not* intend to open the forum to the same panoply of activity permitted in the latter fora. In this regard, we find useful *A Guide on Safety Rest Areas for the National System of Interstate and Defense Highways*, AAASHO (1968), recommended by the FHWA itself for guidance at 23 C.F.R. § 625.5 (1990):

> Rest areas are to be provided on Interstate highways as a *safety measure.* Safety rest areas are off-roadway spaces with provisions for *emergency stopping and resting by motorists for short periods.* They have freeway-type entrance and exit connections, parking areas, benches and tables and usually have toilets and water supply, where proper maintenance and supervision are assured. They may be designed for *short-time picnic use* in addition to parking of vehicles for *short periods. They are not to be planned for use as local parks. Areas for family leisure picnics, active recreation, waterfront activities, or overnight camping are not to be developed as part of an Interstate highway.*

*A Guide on Safety Rest Areas for the National System of Interstate and Defense Highways* 2, AAASHO (1968) (em-

phasis added). In considering the nature of the forum, and in attempting to divine the intent of the government in creating the forum, we think the highlighted language above does much to diminish the force of Sentinel's analogy to city parks.

Further, in considering the nature and purpose of "safety rest areas" within the overall context of the Interstate System, it is clear to us that the words "safety" and "rest" are the overarching concerns attending the government's creation of such places.[15] It is of course also clear that some types of expressive activity are often subsumed within and consonant with these purposes; picnicking with the family, chatting and stretching one's legs, or relaxing for a while with a newspaper are all activities that one would expect to occur regularly at interstate rest areas.

Nevertheless, the practice of allowing some speech activity on interstate property does not amount to the dedication of such property to speech activities. *See Kokinda*, 110 S.Ct. at 3121. Once again, the Supreme Court has held "that '[t]he government does not create a public forum by ... *permitting* limited discourse, but only by intentionally opening a non-traditional forum to public discourse.' " *Id.* (emphasizing *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449). Here, the government did not create rest areas for the purpose of providing a forum for expressive activity; "[t]hat such activity occurs in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes." *Cornelius*, 473 U.S. at 805, 105 S.Ct. at 3450. We accordingly hold that an interstate rest area is a non-public forum.

In light of this holding, any restrictions imposed by the DBS upon Sentinel's placement of newsracks in the nonpublic forum are tested only for reasonableness. As the Supreme Court has explained,

---

**15.** Like Colonel Hugh Hardison of the Georgia State Patrol, Atlanta,

"We firmly believe that a rested and relaxed driver is a safer and more alert driver. This is the primary reason for rest areas. We urge the motoring public to take advantage of the

clean, well-kept rest areas for periodic stops on a trip. They are an essential part of a safe travel insurance policy."

*Safety Rest Area ... the Traveler's Haven,* Fed. Highway Admin. pamphlet (April, 1980).

The Government's decision to restrict access to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation. In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated.... Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling. The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering that speaker's message.

. . . .

The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances.

*Cornelius,* 473 U.S. at 808–09, 105 S.Ct. at 3452–53 (citations omitted). "Even conceding that the forum here has been dedicated to some First Amendment uses, and thus is not a purely non-public forum, under *Perry,* regulation of the reserved nonpublic uses would still require application of the reasonableness test." *Kokinda,* 110 S.Ct. at 3121 (citing *Cornelius,* 473 U.S. at 804–06, 105 S.Ct. at 3450–51). Thus, in judging the constitutionality of speech restrictions in a nonpublic forum, regulations are valid if "they are reasonable in light of the purpose which the forum at issue serves." *Perry,* 460 U.S. at 49, 103 S.Ct. at 957 (footnote omitted); *see Belsky,* 799 F.2d at 1489.

### B.

The district court found that both the administrative fee and liability insurance requirements were valid and reasonable contractual conditions on Sentinel's placement of its newsracks at the rest areas. Although we agree that neither requirement seems problematic as a general prop-

osition, we reverse and remand the district court's rulings on these issues.

First, it is well established that a licensing fee is permissible, but a state or municipality may charge no more than the amount needed to cover administrative costs. *See Cox v. New Hampshire,* 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941). The government may not profit by imposing licensing or permit fees on the exercise of first amendment rights, *see Murdock v. Pennsylvania,* 319 U.S. 105, 113–114, 63 S.Ct. 870, 875–876, 87 L.Ed. 1292 (1943), and is prohibited from raising revenue under the guise of defraying its administrative costs. *Gannett Satellite Info. Network v. Metropolitan Transp. Auth.,* 745 F.2d at 774 (citing *Murdock,* 319 U.S. at 112–115, 63 S.Ct. at 874–876).

The fee provision in the agreement between Sentinel and the DOE in this case provides that the Sentinel will pay a five-cent administrative fee for each newspaper sold by vending machine at each rest area location.[16] The only evidence in the record supporting the reasonableness of this charge, however, is Bassett's testimony that he telephoned transportation officials in other states who recommended that he charge a five-cent fee. Bassett performed no cost studies before setting the fee, and has kept no cost records since implementing the contract, though he has speculated that the costs of administration exceed the amounts received from the fee. Moreover, although the same fee has evidently been charged to each newspaper so far, there are no standards present governing how much Bassett may charge in the name of administration, and he is free to negotiate the amount with each newspaper with whom he deals.

We do not believe that an administrative fee such as the one at issue here is *per se* unconstitutional. *See Jacobsen v. Crivaro,* 851 F.2d 1067, 1071 (8th Cir.1988). Once again, in this context, fees that cover only the administrative costs of a license are

---

**16.** This provision is contained in the final contract executed between Castor and Farber on December 29, 1989. The original contract executed by Farber included reference to the cost of processing application letters.

permissible. *Id.* (citing *Eastern Conn. Citizens Action Group v. Powers*, 723 F.2d 1050, 1056 (2d Cir.1983). Nevertheless, although we make no ultimate opinion here as to the reasonableness of the nickel-per-paper fee, we believe there is simply insufficient evidence in the record thus far to indicate that the fee is reasonably related to the DBS's costs of administering the newsracks at the rest areas. *See Chicago Newspaper Publishers v. City of Wheaton*, 697 F.Supp. 1464, 1471–72 (N.D.Ill.1988). A five-cent fee imposed upon a daily newspaper that sells for thirty-five cents is not insignificant. More assurances are required to guarantee that such a fee is not an unconstitutional tax on Sentinel's first amendment rights. *See Murdock*, 319 U.S. at 114, 63 S.Ct. at 875. We therefore REMAND this issue to this district court for further findings; in so doing, we note that the lack of evidence supporting the reasonableness of the administrative fee here is intimately related to the absence of any standards, policies, studies or procedures channeling Bassett's discretion in administering the permit scheme.[17]

The district court found the liability insurance provision to be reasonable because it represents the limits of the DOT's tort liability. We agree that Florida may well have a legitimate interest in protecting itself from liability for injuries associated with the use of vending machines at interstate rest areas. *See Jacobsen v. Harris*, 869 F.2d 1172, 1174 (8th Cir.1989); *see also Lakewood*, 108 S.Ct. at 2157 & n. 8, 2165 (White, J., dissenting) (noting variety of potential safety risks posed by newsboxes adduced at trial, and that although some dispute existed between the parties as to how substantial was City's risk of being held liable for a newsbox-caused injury, there remained "sufficient risk to suggest that avoiding such liability" was a legitimate concern of the municipality). Nevertheless we reverse the district court's finding of reasonableness on this point for two reasons.

First, unlike the evidence presented at trial in the *Lakewood* case, there as yet appears to be nothing in this record demonstrating the state's need for an insurance requirement. While we believe that such a requirement is likely reasonable, the complete lack of any testimony or other evidence establishing such a need is problematic.

More troubling, however, is the uncontroverted evidence suggesting that only the newspaper vending machines at the rest areas are being forced to carry liability insurance, while other vendors' machines, such as Coke or Pepsi, are apparently exempt from such a requirement. On this point, we can see no principled distinction justifying the disparate treatment of newsracks, and agree that it is impermissible to impose more stringent requirements upon the exercise of Sentinel's first amendment rights than are imposed on other vending machine permittees. *See Plain Dealer Publishing Co. v. City of Lakewood*, 794 F.2d 1139, 1147 (6th Cir.1986), *aff'd on other grounds*, 486 U.S. 750, 108 S.Ct.

---

**17.** We note here that as long as the fee charged by the state is demonstrated to be reasonably limited to the purpose of meeting the expenses incident to the administration of the permit scheme here, *see Cox*, 312 U.S. at 577, 61 S.Ct. at 766, there are no other separate limitations on the size of the fee, such as a requirement that such charges only be limited to a token amount. In *Central Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515 (11th Cir.1985), *cert. denied*, 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986), a panel of our Circuit interpreted *Cox* and *Murdock* as allowing "only nominal charges for the use of city streets and parks to further First Amendment activities. An ordinance which charges more than a nominal fee for using public forums for public issue speech, violates the First Amendment." 774 F.2d at 1523. The analysis and holding of *Central Florida* were explicitly linked to the heightened concerns attending the regulation of expressive activity in a traditional or "quintessential" public forum. *See id.* at 1522–23; *see also Nationalist Movement v. City of Cumming*, 913 F.2d 885, 891 n. 6 (11th Cir.1990) (observing that our interpretation of *Cox* was informed by *Murdock* and more recent Supreme Court cases involving "traditional" public fora, and stating that panel could find no other "public forum" cases to provide a basis for reevaluating *Central Florida's* holding). Because we hold today that interstate rest areas are *nonpublic* fora, the heightened scrutiny and concerns attending traditional fora noted in the *Central Florida* decision are not implicated, and that case does not control here.

2138, 100 L.Ed.2d 771 (1988). In this regard, the Supreme Court has held that "differential treatment ... [for] the press ... is presumptively unconstitutional." *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585, 103 S.Ct. 1365, 1372, 75 L.Ed.2d 295 (1983). Therefore, on this ground too, the district court's finding of reasonableness is REVERSED and REMANDED for further consideration.

## IV.

In summary, then, we reject any challenge to 23 U.S.C. § 111(b), but hold that Sentinel has succeeded in bringing a facial challenge to the constitutionality of Florida's unwritten "scheme" for permitting placement of newsracks at interstate rest areas. The state of Florida and the DBS simply cannot continue to take an utterly discretionary, "seat of the pants" regulatory approach towards activity that is entitled to first amendment protection; the state agencies in this case must establish some type of written regulatory or statutory scheme with specific criteria to guide the discretion of officials administering it. Moreover, the district court should review such a scheme, determine factually how it functions, and assess whether it meets the requirements of law.

In making its determinations, the district court should keep in mind our holding that interstate rest areas are nonpublic fora, and test any proposed regulations, restrictions, or requirements in light of the appropriate level of scrutiny. For the foregoing reasons, the judgment of the district court is REVERSED, and this case is accordingly REMANDED for proceedings consistent with this opinion.

EDMONDSON, Circuit Judge, dissenting:

I agree with most of what the court says in today's opinion, but I write separately to dissent from the court's decision to remand for further proceedings in the district court. I agree, for the reasons offered by the court, that Florida's unwritten regulatory scheme is facially unconstitutional. I also agree that interstate rest areas are nontraditional public forums, allowing for state regulation of First Amendment activity taking place in these locations as long as the regulation is "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educational Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). And, even assuming the regulatory scheme as a whole satisfies the First Amendment, I agree that the licensing fee and liability insurance provisions imposed on plaintiff by the state of Florida are unconstitutional as applied, for the reasons the court suggests.

Despite resolving—and, in my view, resolving correctly—the issues presented by plaintiff's appeal, the court treats these conclusions as tentative, preliminary holdings and remands the case for a further evidentiary hearing and more complete findings of fact and conclusions of law. I see no need for further fact-finding and decision-making by a district court. We know enough now to decide the case before us. The parties have stipulated that the relevant facts are undisputed, and the district court has made factual findings and entered final judgment after a full-blown bench trial.[1]

Rather than dispose of the issues presented on appeal, today's court tells

1. Federal Rule of Civil Procedure 52(a) provides that "[i]n all actions tried upon the facts without a jury, ... the [trial] court shall find the facts specially and state separately its conclusions of law thereon...." As the court points out, the district court below erroneously characterized plaintiff's attack on the state scheme as an "as-applied" challenge and therefore did not "state separately its conclusions of law" on the issue of the scheme's facial constitutionality. But, Rule 52(a) is not a jurisdictional requirement and is intended to provide an adequate basis for appel-

late review of a district court's decision. As a result, "a remand is not required 'if a complete understanding of the issues may be had without the aid of separate findings.'" *Armstrong v. Collier*, 536 F.2d 72, 77 (5th Cir.1976). A remand is unnecessary here where "all the evidence is documentary and the appellate court can pass upon the facts as well as the trial court, or if all the facts relied upon to support the judgment are in the record and are undisputed, or if the record as a whole presents no genuine issue as to any material fact." *Id.* (citations

"the state agencies in this case [to] establish some type of written regulatory or statutory scheme with specific criteria to guide the discretion of officials administering it." [2] After these new regulations are adopted, the district court is told to review the new scheme, "keep[ing] in mind" the advisory conclusions the court expresses in today's opinion. I believe that *if* the state of Florida chooses to adopt new regulations in the face of today's opinion [3] and *if* Sentinel finds these new regulations objectionable, then the new regulations ought to be challenged in another lawsuit. I worry that the effect of the court's rulings today will be to recast the district court in an ongoing role as overseer of Florida's regulation of newsracks in public rest areas. I see no reason to adopt this approach, especially when Sentinel has not requested it.

omitted). Not only are all of these factors present in this case, but the district court's exhaustive factual findings are unchallenged on appeal.

2. The court nowhere addresses from where it derives the authority to tell the state of Florida to adopt new regulations, especially when today's court has explicitly declined to make a final ruling on the constitutionality of the existing, unwritten regulatory scheme.

3. Under the general delegation of authority provided in 23 U.S.C. § 111(b), the state of Florida presumably could choose to adopt no new regulations (that is, choose to allow unlimited access) or could choose to prohibit all vendors, or possibly even all newspaper vendors, from placing machines in interstate rest areas located within the state. *Cf. City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 762 n. 7, 108 S.Ct. 2138, 2147 n. 7, 100 L.Ed.2d 771 (1988) (leaving open the possibility that municipality could ban newsrack placement entirely); *id.,* 108 S.Ct. at 2155–58 (White, J., dissenting) (three justices conclude that municipality may constitutionally ban newsrack placement entirely from traditional public forums). Even if this were not the situation, and today's opinion leads inevitably to the adoption in the future of a new set of state regulations limiting newsrack placement, this lawsuit by Sentinel against the existing regulatory scheme does not bestow upon federal courts the authority to supervise indefinitely state regulation in this area.